DENNIS R. BAGNERIS, SR., Judge.
hThe defendant, Steven Williams, appeals his second-degree murder conviction and his sentence of life imprisonment at hard labor with the possibility of parole. For the reasons that follow, we affirm the conviction and the sentence imposed.
STATEMENT OF CASE
On Octobér 8, 2009, the State indicted the defendant for the April 3, 2006, second degree murder of Demarcus Jordan. At the time of the murder, the defendant was seventeen years old. The defendant pled not guilty. However, on January 9, 2012, following a three day trial, the defendant was found guilty as charged by a jury vote of eleven to one for conviction.
On May 3, 2013, the defendant filed a motion for new trial. The motion was denied.[1] On December 18, 2014, following a hearing in accordance with Miller v. Alabama, — U.S. -, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012);[2] La. C.Cr.P. art. 878.1(2013), and La. R.S. 15:574.4(E) (2013), the trial court sentenced the defendant to life imprisonment at hard labor with the possibility of parole.
Thereafter, the defendant filed the present appeal. '
STATEMENT OF FACT
The testimony adduced at trial included testimony regarding a prior shooting of the victim which happened on May 7, 2005, as well as the victim’s fatal shooting of April 3, 2006.
Lyndra Maurice, a senior 911 operator with the NOPD, identified audio recordings the State introduced into evidence. These included the recording from the May 7, 2005 shooting of the victim, Demar- *245 cus Jordan, as well as the recording relative to the shooting in the present matter.
NOPD Detective Ryan Aucoin investigated the May 7, 2005 shooting of- the victim. He advised that the lead investigator in the May shooting case was Detective Greg Hamilton. Det. Aucoin said he developed Tory Gloster, Jerrell Brown, and Vernon Williams as suspects through his telephone conversations with the .victim. Det. Aucoin relayed that Det. Hamilton and he were able to link the defendant in the instant matter to Tory Gloster. Det. Aucoin further explained that the case against Jerrell Brown and Vernon Williams was dismissed in 2006 when the victim was murdered. Det. Aucoin added that Detective Hamilton and he believed the victim’s murder was related to his 2005 shooting.
Detective Greg Hamilton, who was also the lead detective in the instant murder case, identified the State’s crime scene photographs. Det. Hamilton spoke with the victim’s wife, Mrs. Angela Williams. Mrs. Williams told him she witnessed the murder. Det. Hamilton stated that Mrs. Williams identified the defendant from a photo lineup as the man she saw shoot and kill her husband.
|sDet. Aucoin reminded Det. Hamilton that Brown, Vernon Williams and Gloster had been arrested as suspects in the victim’s 2005 shooting. He acknowledged on cross-examination that Vernon “Buck” Williams was in jail at the time of the victim’s murder. Det. Hamilton also revealed that another .witness, in addition to the victim’s wife, had stated that the defendant killed the victim. However,’.he said this witness was not reliable because he was a heroin addict and was in jail when the victim was murdered.
Upon redirect examination, Det. Hamilton identified Robert- Vaughn as the witness who said the defendant confessed to the victim’s murder. Vaughn told Det. Hamilton that Vaughn and the defendant were friends. Although Vaughn was in jail for a parole violation at the time of the murder, Vaughn : claimed that the defendant admitted to the murder upon Vaughn’s release. Det. Hamilton said that Vaughn told him that the defendant killed the victim because the victim was scheduled to testify against Vernon - “Buck” Williams in the 2Q05 shooting of the victim. Another person, Dwayne Finch, was also present when the defendant allegedly confessed to the murder. Det. Hamilton memorialized Vaughn’s conversation in his report; however, he did not record Vaughn’s statement. Det. Hamilton indicated that Vaughn was probably deceased at the time of the defendant’s trial because Vaughn had been suffering with a terminal illness.
The State and defense stipulated that the defendant’s house was searched on April 4, 2006, and that ho weapons or ammunition were found.
The State and defense^ also stipulated that Kenneth Leary was a ballistics expert; and if called to testify, he would state that the casings collected from the murder scene were consistent with two types of weapons— a .40 caliber weapon and a .9 millimeter firearm.
^Detective Timothy Sisen testified that he served the arrest warrant on the defendant. Dwayne Finch was with the defendant at the time of the arrest. Det. Sisen recalled retrieving a .45 caliber pistol. The pistol was located near Finch in the residence.
■ Angela Williams 'testified that she and the victim were married in 2004. She said that the victim’s arm had been rendered useless by the 2005 shooting. During the victim’s recuperation from this . shooting, she and the victim spoke to the District Attorney about their concerns for his safe *246 ty. She explained that the victim was set to testify as a witness in the upcoming trial of Vernon Williams regarding Williams’ involvement in the victim’s 2005 shooting.
With reference to the victim’s fatal shooting on April 3, 2006, Mrs. Williams recalled that the victim was sitting outside of the front door of their residence. Mrs. Williams was inside the residence. She was about five feet from the victim arid could see him through the open door. She and the 'victim were talking when she noticed a boy enter the yard. The boy asked the victim when the next door neighbor would be home. The victim told the boy he did. not know. • After that, Mrs. Williams heard the victim say: “Oh, f — ” and saw him attempt to run. The boy produced a gun and began shooting the victim. She closed the door, but it popped open, allowing her to see the first shooter. Then, she saw a second gunman step from behind a wall and also begin to shoot the victim. She was unable to get a look at the second gunman. She called 911 and ran to the victim. As she did so, she saw the shooters jump into a small silver/gray car and speed from the area. When the police arrived, Mrs. Williams described the shooter she saw as a fifteen or sixteen year old black male wearing a white T-shirt, a hat, standing about 5'4" |sand wearing braids in his hair. She also described how the shooter bit his lip as he shot the victim.
Later, on May 8, 2006, Mrs. Williams identified the defendant as the shooter from one of two photographic lineups presented by Det. Hamilton. At trial, Mrs: Williams also made an in-court identification of the defendant as the man she saw shoot and kill the victim.
Dr. Dana Trosclair testified by stipulation as an expert in forensic pathology. Dr. Trosclair noted that the victim suffered five gunshot wounds and that four bullets were retrieved from his body. The fatal shot entered the victim’s left back, passed through the left lung, fractured the spine, entered the right lung and exited on the right side.
The State’s final witness was Don Hancock, the telecommunications supervisor for the Orleans Parish Sheriffs Office. As part of his job, Mr. Hancock maintained the telecommunications systems at the prison. He said he was responsible for archivirig recorded prisoner calls and was the custodian of those records. Mr. Hancock identified and authenticated both the tape recordings and the transcripts of the defendant’s jailhouse calls.
Regarding the recording of the defendant’s jailhouse calls, Mr. Hancock explained that every inmate call is recorded and stored as part of a regular protocol at the prison. He identified the disc coritain-ing the calls made by the defendant from January 1, 2011, through January 1, 2013, while the defendant was in custody at Or-learis Parish Prison. The State played the recording for the jury.
ERRORS PATENT
Our review of the record for errors patent reveals none.
1 ^ASSIGNMENT OF ERROR NUMBER 1
In his first assignment of error, the defendant argues that the State was erroneously allowed to introduce two instances of hearsay evidence which violated his confrontation rights-1 — the statement of the deceased witness, Robert Vaughn, and the jailhouse' calls placed by the defendant.
The Sixth Amendriient to' the United States Constitution and Article I, § 16 of the Louisiana Constitution guarantee an accused in a criminal prosecution the right to confront witnesses against him. The United States Supreme Court has held that this guarantee, which is extended to *247 the States by the Fourteenth Amendment, includes the right to cross-examine witnesses. Cruz v. New York, 481 U.S. 186, 189, 107 S.Ct. 1714, 1717, 95 L.Ed.2d 162 (1987); State v. Collins, 2010-0757 (La. App. 4 Cir. 5/11/11), 65 So.3d 271, 286.
The Confrontation Clausé bars the admission of an out-of-court “testimonial” statement against a criminal defendant unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine the declarant. Crawford v. Washington, 541 U.S. 36, 68, 124 S.Ct. 1354, 1374, 158 L.Ed.2d 177 (2004); Davis v. Washington, 547 U.S. 813, 821, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006).
Hearsay is defined by La. C.E. art. 801(C) as “a, statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted.” Hearsay is inadmissible unless it falls within certain exceptions. La. C.E. arts. 802-804.
While the Crawford Court specifically declined to define “testimonial,” it recognized that, at a minimum, testimonial statements include “prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police | ^interrogations.” Crawford, 541 U.S. at 68,124 S.Ct. at 1374. The Supreme Court stated that “testimony” is “[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.” Id., 541 U.S. at 51, 124 S.Ct. at 1364.
The Sixth Amendment bestows a right of confrontation to confront witnesses who “bear testimony” against him. According to the Supreme Court, an accuser making a formal statement to government officials bears testimony in a sense that a person making a casual' remark to an acquaintance' does not. Id. Some examples of testimonial statements- include affidavits, custodial examinations, depositions, prior testimony, confessions, or similar pretrial statements that declarants would reasonably expect to be used in a prosecution. Id.; State v. Lang, 2013-21, p. 16 (La.App. 5 Cir. 10/9/13), 128 So.3d 330, 339, writ denied, 2013-2614 (La.5/2/14), 138 So.3d 1244.
In this case, defense counsel cross-examined Det. Hamilton about his development of witnesses — other than the victim’s wife — to ’the murder. Det. Hamilton replied:
... Yes, I did find another witness[3] who came in and provided information about [the defendant] confessing to them about the crime.'
A.defendant cannot avail himself of an alleged error unless he made a contemporaneous objection at the time of the error. La. C.Cr.P. art...841 (A). • In this matter, the defense not only did not object to Det. Hamilton’s response, it went on to question Det. Hamilton regarding his assessment that the witness was a heroin addict and was unreliable.
| sNotwithstanding, even if the identification of the witness had been preserved for appellate review and Det. Hamilton’s testimony regarding the witness contained inadmissible hearsay, confrontation clause violations are subject to a harmless error analysis. State v. Henderson, 2013-0526 (La.App. 4 Cir. 2/19/14), 136 So,3d 223, 230. The admission of hearsay testimony “is harmless error where the effect is merely cumulative or corroborative of other testimony adduced at trial.” State v. Johnson, 389 *248 So.2d 1302, 1306 (La.1980). Established case law provides that the verdict may-stand if the reviewing court determines that the guilty verdict rendered in the particular trial is unattributable to the error. Sullivan v. Louisiana, 508 U.S. 275, 279, 113 S.Ct 2078, 2081, 124 L.Ed.2d 182 (1993).
Here, the victim’s wife testified as an eyewitness to the victim’s murder. She unequivocally testified that she witnessed the defendant shoot and kill her husband. Mrs. Williams’ testimony indicated that she was no more than five feet from the victim whén he was shot and had time to get a good look at the shooter. We also note that the shooting occurred during daylight hours. Based on this evidence, we conclude that if there was an error, it was harmless given the evidence of guilt presented at trial. Therefore, defendant’s claim that his conviction should be • set aside because the trial court erroneously allowed inadmissible testimony regarding Robert Vaughn’s statement is without merit.
Similarly, we also find the defendant’s claim that the trial court erred because it allowed the State to introduce taped jailhouse phone calls into evidence lacks' merit. The defendant contends these taped phone calls contained inadmissible hearsay because the voices were not identified or authenticated; accordingly, their admission into evidence violated his confrontation rights.
|3Phone calls'from an inmate to another private citizen are generally non-testimonial. In State v. Norah, 2012-1194, p. 26 (La.App. 4 Cir. 12/11/13), 131 So.3d 172, 190, units denied, 2014-0084 (La.6/13/14), 140 So.3d 1188 and 2014-0082 (La.6/20/14), 141 So.3d 287, this Court discussed the nature of inmate calls as follows:
Phone calls from an inmate to another private citizen are generally ‘non-testimonial.’ These conversations are simply too attenuated • in kind - from a police interrogation. While inmates are warned that their calls are being recorded, the statements of inmates and those with whom they are speaking are ‘non-testimonial’ in that they are not attempting to prove some fact for introduction at trial such as when the police interrogate a suspect. These statements are not made ‘to a police officer, during the course of an investigation, or in a structured setting designed to elicit responses that are intended to be used to prosecute him.’ [United States v.] Castro-Davis, 612 F.3d [53,] 65 [ (1st Cir.20'10) ]. These calls were conversations amongst friends, and in no way could be considered testimonial, [footnote omitted]
In the present case, the recorded telephone conversations are non-testimonial under Crawford. Upon our review, the statements contained in the recorded telephone conversations were spoken in casual conversation between defendant and friends and/or family members. The parties spoke informally and without coercion. Moreover, in these conversations, the defendant never admitted he killed the victim; rather, he consistently denied any involvement in the victim’s murder. Hence, the admission of the jailhouse recordings did not violate defendant’s right of confrontation.
ASSIGNMENT OF ERROR NUMBER 2
In his second assignment of error, the defendant claims he, was deprived of a fair trial because of prosecutorial misconduct during closing argument. He maintains that the prosecutor’s argument violated La. C.Cr.P. arts. 770, 774 and 775; and as a result, a mistrial should have been granted.
|,(/‘Louisiana jurisprudence on prosecutorial misconduct allows prosecu *249 tors wide latitude in choosing closing argument tactics.” State v. Legrand, 2002-1462, p. 16 (La.12/3/03), 864 So.2d 89, 101. Although La. C.Cr.P. art. 774 confines the scope of argument to “evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom, and to the law applicable to the case,” the trial judge has broad discretion in controlling the scope of closing argument. Id. Accordingly, even where the State exceeds the bounds of proper argument, a conviction will not be reversed unless the court is thoroughly convinced that the argument influenced the jury and contributed to the verdict. Id.; see also United States v. Rodriguez, 43 F.3d 117, 124 (5th Cir.1995) (“prosecutorial misconduct must be so pronounced and persistent that it casts serious doubt upon the correctness of the jury’s verdict.”)
In this case, the defendant references portions of the record as illustrations of alleged prosecutorial misconduct, including instances where the State branded defense counsel “liars” and accused them of hiding evidence from the jury. Specific instances include the following highlighted statements:
ADA: ... And when they stood up here and looked you in the eyé and said that there is only, one person that can tie him to this crime, that’s only one person that can do that. Not only was that inaccurate and a lie, it certainly wasn’t evidence.
ADA: ... But before we get to the credibility of Robert Vaughn, I want to talk about the credibility the Defense has ... Did [defense counsel] want you to hear [that Mrs. Angela Williams was 100% certain that the defendant was the murderer]? No.
Let’s talk a little bit more about credibility. In opening statements when the Defense stood in front of you and looked each one of you in the eye and said there’s only one person that can tie the defendant to this case, there’s just one person that’s it, think they didn’t know about Robert Vaughn? Think they didn’t know that that confession existed ... The fact of the matter is, ladies and gentlemen, they knew that confession existed, they just didn’t think you’d get to hear about it.”
| ^According to the defendant, other instances of improper argument made by the prosecutor included statements that 1) the jury would be “good men” only if they did something in this case; 2) the prosecutor’s assertion that “we know [the victim] was gunned down by three individuals that he could identify, Buck;, Jerrell Brown, and he also identified Tory Gloster as being in that vehicle;” 3) the prosecutor’s reference that the defendant was “another member of the Whitney boys;” and 4) the prosecutor’s suggestion that the defendant tried to get his alleged girlfriend to lie.
Courts do not condone the use of inflammatory language; however, while such language may be professionally questionable, “the requirements of due process and canons of professional ethics or standards are not co-extensive.” State v. Ortiz, 2011-2799, p. 6 (La. 1/29/13), 110 So.3d 1029, 1034. Rather, “the touchstone of due process analysis in cases of alleged prosecuto-rial misconduct is the fairness of the trial, not the culpability of the prosecutor ... the aim of due process ‘is not punishment of society for the misdeeds of the prosecutor but avoidance of an unfair trial to the accused.’ ” Id., (citations and internal quotation marks omitted).
Our review of the record shows that the bulk of the State’s arguments consisted of fair statements of the evidence admitted and,the lack of evidence to corroborate the defense’s theory .of the case. Moreover, the trial court instructed the jurors both at *250 the commencement of trial and prior to their deliberation that the attorneys’ arguments were not evidence. Accordingly, we cannot say that the State’s representation to the jury that they need not believe anything defense counsel said amounted to prejudicial error.
hJn reviewing the State’s closing remarks in the context of the entire record, we find that the alleged improper remarks did not influence the jury so that they contributed to the verdict. Thus, in light of the traditional breadth accorded the scope of closing arguments by the courts of this State, the State’s closing comments in this case do not merit overturning the defendant’s conviction and sentence. See State v. Bridgewater, 2000-1529, p. 33 (La.1/15/02), 823 So.2d 877, 903 (use of the words “animal”, “cold-blooded killer” and “an animal on the hunt for prey” did not contribute to the guilty verdict).
This assignment of error is without merit.
ASSIGNMENT OF ERROR NUMBER 3
. In a final assignment, the defendant argues his life sentence with the possibility of parole is excessive.- He maintains that his sentence is illegal in that it violates the prohibition against ex post facto laws. He also contends his sentence is not authorized by La. R¿S. .14:30.1. Consequently, this matter should be remanded to the trial court for resentencing to the “next responsive verdict.”
Both the Eighth Amendment to the United States Constitution and Article I, § 20 of the Louisiana Constitution prohibit the imposition of excessive and cruel punishment. State v. Wilson, 2014-1267, p. 24 (La.App. 4 Cir. 4/29/15), 165 So.3d 1150, 1165. A sentence is considered excessive, even when it is within the applicable statutory range, if it is grossly disproportionate to the seriousness of the offense or imposes needless and purposeless pain and suffering. In reviewing a sentence for excessiveness, the appellate court must consider the punishment and the crime in light of the harm to society and gauge whether the penalty is so disproportionate as to shock the court’s sense of justice. State v. Wilson, 2011-0960, p. 9 (La.App. 4 Cir. 9/5/12), 99 So.3d 1067, 1073. The- trial judge is li3afforded wide discretion in determining sentences, and the'court of appeal will not s,et aside a sentence for excessiveness if the record' supports the sentence imposed. State v. Fountain, 2007-1004, p. 5 (La.App. 4 Cir. 1/23/08), 976 So.2d 763, 766.
For those offenders convicted of .second degree murder in Louisiana, La. R.S. 14:30.1 mandates a sentence of life imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence. However, in 2012, the United States Supreme, Court, in Miller v. Alabama, - U.S. -, 132 S.Ct. 2455, 2460, 183 L.Ed.2d 407 (2012), held that a'state’s statutory sentencing scheme that mandates life imprisonment without parole, for those offenders under the age of eighteen years at the time they committed a homicide offense, violates the Eighth Amendment prohibition of. “cruel and unusual punishments.” The Miller Court did not prohibit life imprisonment without parole for juveniles, but instead required that the statutory sentencing scheme authorize a sentencing court to consider an offender’s youth and attendant characteristics as mitigating circumstances before deciding whether to impose the harshest penalty for juveniles who have committed a homicide offense. State v. Simmons, 2011-1810, p. 2 (La.10/12/12), 99 So.3d 28 (per curiam).
In 2013, in response to Miller v. Alabama, supra, the Louisiana Legislature *251 enacted La. C.Cr.P. art. 878.1 and La. R.S. 15:574.4(E)(1).
La. C.Cr.P. art. 878.1, which became effective on August 1,2013, provides:
A. In any case where an offender is to be sentenced to life imprisonment for a conviction of first degree murder (R.S. 14:30) or second degree murder (R.S. 14:30.1) where the offender was under the age of eighteen years at the time of the commission of the offense, a hearing shall be conducted prior to sentencing to determine whether the sentence shall be imposed with or without parole eligibility pursuant to the provisions of R.S. 15:574.4(E).
lv,B. At the hearing, the prosecution and defense shall be allowed to introduce any aggravating and mitigating evidence that is relevant to the charged offense or the character of the offender, including but not limited to the facts and circumstances of the crime, the criminal history of the offender, the offender’s level of family support, social history, and such other factors as the court may deem relevant. Sentences imposed without parole eligibility should normally be reserved for the worst offenders and the worst cases.
La. R.S. 15:574.4(E)(1) provides in pertinent part as follows:
E. (1) Notwithstanding any provision of law to the contrary, any person serving a sentence of life imprisonment for a conviction of first degree murder (R.S. 14:30) or second degree murder (R.S. 14:30.1) who was under the age of eighteen years at the time of the commission of the offense shall be eligible for parole consideration pursuant to the provisions of this Subsection if a judicial determination has been made that the person is entitled to parole eligibility pursuant to Code of Criminal Procedure Article 878.1 and all of and the following conditions have been met: ■
a) The offender has served thirty-five years of the sentence imposed.
b) The offender has not committed any. disciplinary offenses in the twelve consecutive months prior to the parole eligibility date_
(c) The offender has completed the mandatory minimum of one hundred hours of prerelease programming' in accordance with R.S. 15:827.1.
(d) The offender has completed substance abuse treatment as applicable.
(é) The offender has obtained a GED certification, unless the offender has previously obtained a high' school diploma or is deemed by a certified educator as being incapable of obtaining a GED certification due to a learning disability. If the offender is deemed incapable of obtaining a GED certification, the offender shall complete at least one of the following:
(i) A literacy program.
(ii) An adult basic education program.
(iii) A job skills training program.
(f) The offender has obtained a low-risk level designation determined by a validated risk assessment instrument approved by the secretary of the Department of Public Safety and Corrections. ■
L/rhe defendant herein contends that the trial court erred in relying on La. C.Cr.P. art. 878,1 and La. R.S. 15:574.4(E) in sentencing him. The effective date of these provisions was August 1, 2013. The defendant committed the instant offense of second degree murder in 2006. According *252 to the defendant, in finding that La. C.Cr.P. art. 878.1 applied to this matter and then sentencing him pursuant to La. R.S. 15:574.4(E), the trial court violated the prohibition against ex post facto laws.
In State v. Graham, 2014-1769, p. 8 (La.App. 1 Cir. 4/24/15), 171 So.3d 272, 278, the First Circuit considered the same issue, and concluded:
... any consideration of La. C.Cr.P. art. 878.1 and La. R.S. 15:574.4(E) in resen-tencing the defendant, would not have been, contrary to the defendant’s assertion, an ex post facto violation. In State v. Jones, 12-788 (La.App. 5 Cir. 5/23/13), 165 So.3d 74 (unpublished), writ granted, 13-2039 (La.2/28/14), 134 So,3d 1164, a decision handed down after Miller but prior to State v. Tate, 12-2763 (La,ll/5/13), 130 So.3d 829, 841-44, cert. denied, — U.S. -, 134 S.Ct. 2663, 189 L.Ed.2d 214 (2014) (applying La. C.Cr.P. art. 878.1 and La. R.S. 15:574.4(E)(1) prospectively only), the defendant (seventeen years old at the time of the offense) was convicted of second degree murder and sentenced to life imprisonment at hard labor without benefit of probation, parole, or suspension of sentence. The defendant committed the crime on April 29, 2010, before either Miller or Tate were handed down. The fifth circuit affirmed the conviction, but vacated .that portion of the defendant’s sentence 'that prohibited parole eligibility and remanded the matter for resentencing in conformity with Miller. In State v. Jones, in a writ of certiorari grant[ed] for the above unpublished decision, our supreme court stated:
Defendant is entitled to the benefit of the decision in Miller v. Alabama, 567 U.S. -, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012), because his case was in the direct review pipeline when Miller
was decided. See Griffith v. Kentucky, 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987) (new rules of constitutional criminal procedure apply retroactively to all cases pending on direct review or in the direct review pipeline); compare State v. Tate, 12-27[6]3 (La.11/5/13) [130 So.3d 829] (Miller not retroactive to final sentences subject only 11fito collateral attack) .... On remand of the case, the trial court is directed to hold a hearing in compliance with La. C.Cr.P. art. 878.1, implementing the Miller decision in Louisiana, before resentencing defendant to a term of life imprisonment at hard labor that, in the court’s discretion, after considering any aggravating and mitigating evidence relevant to the offense or the character of defendant, may, or may not, be subject to parole eligibility pursuant to the provisions of La. R.S. 15:574.4(E). '
2013-2039 (La.2/28/14), 134 So.3d 1164 (per curiam).
According to the foregoing, there is no ex post .facto violation in this case. The defendant herein was convicted in 2012 and sentenced in 2014.
The defendant also argues that because the statutory sentence of life imprisonment for second degree murder is unconstitutionally excessive as applied to offenders under the age of eighteen, he should be sentenced under the law in effect in 2006, when this murder was committed, to the highest possible sentence for the next lesser offense — manslaughter. The sentence imposed for a manslaughter conviction in 2006 was forty.years at hard labor.
The court in State v. Fletcher, 49,303, pp. 12-13 (La.App. 2 Cir. 10/1/14), 149 So.Sd 934, 942, found no merit to a similar argument:.
*253 The Louisiana legislature promptly addressed the Miller directive against mandatory life-without-parole sentences for juvenile killers by devising a sentencing procedure which would require that a trial court sentencing a youthful offender review .all pertinent factors before determining whether parole eligibility was warranted. By its very application to only murderers under the age of 18, the provisions of La. C. Cr. P. art. 878.1 mandating a sentencing hearing at which the defense will be given an opportunity to present mitigating factors— which obviously include the defendant’s age as an important part of his social history — satisfy Miller’s requirement that mitigating factors favoring a juye-nile killer be heard in a proceeding held for that purpose...
... life without parole is still a constitutionally acceptable sentence for adult killers and it is not a prohibited sentence for all juvenile killers. Our legislature carefully designed an adequate solution by adding a new statute pertaining to parole eligibility for -juvenile killers which is to be read in | ^conjunction with the first and second degree murder statutes. In the event that the trial court imposes a life sentence with parole eligibility, La. R.S. 15:574.4(E) provides conditions which must be satisfied before the defendant can apply to the parole board for parole consideration. (Emphasis supplied).
Either sentencing scheme of life imprisonment with parole, or life imprisonment without parole, is proper and not unconstitutional under Miller v. Alabama, supra. Accordingly, we find the defendant was not entitled to be sentenced to the next available responsive verdict of manslaughter. See, State v. Graham, 2014-1769 (La. App. 1 Cir. 4/24/15), 171 So.3d 272.
We now turn to the defendant’s argument that his sentence is excessive. At the December 18, 2014, sentencing hearing in this case, the State called Dr. Michael Blue, an expert in forensic psychiatry. Dr. Blue testified that he learned the defendant was'-seventeen years old, two months' shy of his eighteenth birthday, at the time -of the commission of this crime. Blue said that the defendant’s familial history bore a significant degree of turmoil and violence and there was inadequate' supervision in his’household. He noted defendant’s significant violent criminal history included charges of illegal possession of a concealed weapon, unauthorized use of a -movable, illegal use of a firearm,. unspecified drug possession charges and the present conviction for second degree murder. He said the defendant was reluctant to speak of the specifics of his case and did not accept responsibility for actions, perhaps because of his pending appeal. Dr. Blue said it was difficult to get the defendant to connect with the damage his criminal acts caused and the effect it had on victims and potential victims of future crimes. The defendant claimed he would avoid engaging in criminal behavior because of self-preservation— not wanting to be. arrested, incarcerated, shot or stabbed. The defendant expressed no | iRremorse for his victim and said he would avoid future criminal activity “unless financial times were difficult” and “he felt like he had no other choice.”
Dr.- Blue said he -read the Miller v. Alabama case and structured his .examination of the defendant with the view to determining his capacity to change; the likelihood The defendant would engage in future criminal activity; as well as the difference in his potential susceptibility to the outside influences he had at the age of seventeen, as opposed to his current age of twenty-six.
*254 Dr. Blue opined that the defendant possessed some important risk factors that make it likely, though not definitive, that he would engage in criminal activity in the future, i.e., the fact that he engaged in morally depraved and. criminal acts in the past is a strong predictor for future actions; and his lack of empathy for what happened and the fact that he- appeared to struggle to connect how his actions affected other people. However, Dr. Blue cautioned that he could not go so far as to say that the defendant would never change. Dr. Blue stressed that each defendant must be evaluated individually for the medical community to make its best estimation of future prohibited behavior.
Dr. Blue testified that his evaluation of the defendant, in light of Miller, the entire record and victim’s statements, led him to conclude to a reasonable degree of medical certainty that the defendant was likely to engage in criminal behavior again.
Under cross-examination, Dr. Blue said he found no evidence of psychotic symptoms or severe illness. The doctor admitted that the likelihood of recidivism decreases with age. He also agreed that certain individuals benefit from a structured environment. Dr. Blue agreed with the observations made in Miller that | ^juveniles are more susceptible to outside influences and more prone to act before thinking about the consequences of their actions.
The defense called Dr. Sarah Deland, also a forensic psychiatrist, as' its expert. Dr. Deland said she considered the arrest report in this case, as well as the defendant’s criminal history, and an affidavit supplied by the defendant’s mother, which addressed the defendant’s familial history. The doctor interviewed the defendant for about an hour and half on November 1, 2013. The defendant would not recount the facts of this case, so Dr. Deland proceeded to look at this case as though the facts presented proved the defendant’s guilt.
Dr. Deland learned that the defendant had a- history of PTSD, substance 'abuse, anxiety, nightmares, irritability, difficulties with relationships with people and temper problems as a child. The defendant was exposed to drug and1 alcohol use by his family at the age of seven or eight. The defendant was left to his own devices at a ■fairly young age, which in some instances results in a juvenile seeking out alternative structure, i.e., gangs or associations of friends, when there are none in the home. Dr. Deland acknowledged the fact that the defendant has offended in the past, is male, and has suffered from drug abuse place him at risk for re-offending. However, she opined defendant could benefit from a structured environment and there were enough dynamic factors that indicated the defendant has the possibility for change.
This hearing in this matter concluded with the judge sentencing the defendant to life imprisonment with benefit of parole. The judge reasoned:
But the reality of this is, and I hear exactly what you are saying, but the reality of this is even if he’s eligible for parole in thirty-five years, after thirty-five years, there is no likelihood of release. The fact of the matter is there is .a parole board that still must look, of course, at all of that to determine if, in fact, he’s going to be released. There is no, there is no He’s | aneligible for parole; therefore, when he’s fifty-two years old he’s going to be released.” That’s not the way the game goes.
[[Image here]]
So to say then that he should never be eligible for that, I’m sorry. I hear what you are saying:about the other judges *255 who have done it. I hear what you are saying about that but I’m, for a . society never to say % person is eligible for release after they have served thirty-five years in jail, there’s something wrong with that society. For that society to say'that, there is something wrong.
That society should be able to look at a person at fifty-two years old and say to that person, I agree. “Now based on what you’ve done over the last fifty-two [years], you should die in a cage.” I agree with that, or “No, I don’t because of what you’ve done over the last fifty-two [years], we are going to release you.” That’s my view on the subject.
When this Court considers the defendant’s statement that he would not. return to a life of crime “unless financial times were difficult;” that this crime was well thought out and planned for the purpose of eliminating a witness; that the victim was shot in front of his wife; and that the disabled victim and father of two young children knew the defendant, we find that the defendant’s sentence of life with the possibility of parole is not excessive. This finding is buttressed by the testimony of Dr. Blue wherein he concluded tó a reasonable degree of medical certainty that the defendant is likely to engage in criminal behavior again.[4]
|⅞1 Accordingly, .this assignment of error is without merit-,
CONCLUSION
Wherefore, based on' the foregoing reasons, the defendant’s Conviction and sentence are- affirmed.'
.CONVICTION AND SENTENCE AFFIRMED

. The record does not reflect the exact date the defendant’s motion for new trial was denied; however, the court’s minute entry for December 18⅝ 2014, the date of sentencing, indicates: "Defense counsel requested that the court note that the previously filed motion for new trial was denied.”

. In Miller v. Alabama, supra, the United States Supreme Court held that a state’s statutory sentencing scheme that mandates life imprisonment without parole for those offenders under the age of eighteen years at the time they committed a homicide offense violates the Eighth Amendment prohibition of "cruel and unusual punishments.” Miller v. Alabama, 132 S.Ct. at 2460.

. As referenced herein, Det. Hamilton identified Robert Vaughn as this "unnamed" witness.

. We also note that this Circuit and others have found that life sentences without parole were not excessive for seventeen and fifteen year old defendants. See State v. Smoot, 2013-453 (La.App. 5 Cir. 1/15/14), 134 So.3d 1, writ denied, 2014-0297 (La.9/12/14), 147 So.3d 704, where the Fifth Circuit affirmed the imposition of life imprisonment without benefit of parole, probation, or suspension of sentence upon a seventeen year old defendant who shot an elderly, homeless drug addict multiple times; State v. Brooks, 49,033 (La. App. 2 Cir. 5/7/14), 139 So.3d 571, writ denied, 2014-1194 (La.2/13/15), 159 So.3d 459, where the court affirmed the trial court's dé-nial of parole eligibility to a defendant convicted of second degree murder committed when the defendant was less than four months shy of his eighteenth birthday; State v. Fletcher, 49,303 (La.App. 2 Cir. 10/1/14), 149 So.3d 934, writ den., 2014-2205, 171 So.3d 945 (La.6/5/15), cert. den. Fletcher v. Louisiana, — U.S. -, 136 S.Ct. 254, 193 L.Ed.2d 189, 2015 WL 4628101(Mem), where the fifteen years and eight months old defendant shot and killed his parents; he was convicted of two counts of second degree murder and sentenced to life without parole. Wilson, 2014-1267, 165 So.3d 1150, where this Court found no error in the trial court’s imposition of a life sentence without benefit of parole, probation, or suspension of sentence on the defendant convicted of a homicide he committed when he was seventeen years old.