| STATE OF LOUISIANA | * | NO. 2023-KA-0524 |
| --- | --- | --- |
| VERSUS | * | |
| | | COURT OF APPEAL |
| GARRETT J. WARD | * | |
| | | FOURTH CIRCUIT |
| | * | |
| | | STATE OF LOUISIANA |

* * * * * * *

APPEAL FROM
CRIMINAL DISTRICT COURT ORLEANS PARISH
NO. 541-639, SECTION "F"
Honorable Robin D. Pittman, Judge
* * * * * *
**Judge Nakisha Ervin-Knott**
* * * * * *
(Court composed of Judge Daniel L. Dysart, Judge Nakisha Ervin-Knott, Judge
Monique G. Morial)

**ON REMAND FROM THE LOUISIANA SUPREME COURT**

*DYSART, J., DISSENTS WITH REASONS*

Jason R. Williams
District Attorney
Brad Scott
Chief of Appeals
Zachary M. Phillips
Assistant District Attorney
ORLEANS PARISH
619 South White Street
New Orleans, Louisiana 70119

      COUNSEL FOR THE STATE OF LOUISIANA/APPELLEE

Jane Hogan
ATTORNEY AT LAW
310 N. Cherry Street, Suite 1
Hammond, LA 70403

      COUNSEL FOR DEFENDANT/APPELLANT

           **AFFIRMED
DECEMBER 3, 2025**

NEK
MGM

This is a criminal appeal on remand from the Louisiana Supreme Court concerning the manslaughter conviction and sentence of defendant, Garrett Ward ("Defendant").

## STATEMENT OF THE FACTS

The factual background of this case was previously set forth in *State v. Ward*, 2023-0524, — So.3d at — , — , 2025 WL 1135095, at *1 (La. App. 4 Cir. 4/17/25):

> On the evening of January 5, 2018, Defendant attended a dinner party with his girlfriend, Katy Kelly ("Ms. Kelly"), and her work colleagues at Chop House in New Orleans, Louisiana. After dinner, Defendant, Ms. Kelly, Ms. Kelly's co-workers – Jonathan Guy ("Mr. Guy") and Jamie Yorsch ("Ms. Yorsch") – and Ms. Yorsch's husband relocated to the Hot Tin bar atop the Pontchartrain Hotel on St. Charles Avenue in New Orleans, Louisiana.
>
> In the early morning hours, around 1:00 A.M. the next day, a verbal altercation between Defendant and Ms. Kelly ensued at the bar, and Defendant slapped Ms. Kelly in the face. Defendant left the bar and had an encounter with Arnold Jackson ("Mr. Jackson") outside the bar in which he attacked Mr. Jackson – striking Mr. Jackson with his hands and feet. After the attack, Defendant fled to a nearby parking garage.
>
> Kerrie Williamson ("Ms. Williamson"), an eye-witness to the attack, called 911, and upon arriving on the scene, New Orleans Police Department ("NOPD") officers found Mr. Jackson lying on the ground, conscious, with severe blunt force trauma to the head and face. The NOPD officers located Defendant at the nearby parking garage, where he appeared intoxicated, and arrested him for simple battery.

1

When the paramedics arrived on the scene, they transported Mr. Jackson to University Medical Center ("UMC"). At UMC, Mr. Jackson's condition declined, and he required emergency brain surgery. Ultimately, Mr. Jackson succumbed to his injuries on January 18, 2018.

## PROCEDURAL HISTORY

On June 7, 2018, Defendant was charged by grand jury indictment with second degree murder, a violation of La. R.S. 14:30.1, and ultimately pled not guilty to the charge. During trial, several witnesses testified including Kerrie Williamson ("Ms. Williamson"). Pertinent to this remand, the State questioned Ms. Williamson about Defendant's comments towards Mr. Jackson during the attack. At the conclusion of Ms. Williamson's testimony, outside the presence of the jury, defense counsel made an oral motion for mistrial on grounds that the State failed to provide notice of its intent to introduce Ms. Williamson's racially-charged testimony that she heard Defendant call Mr. Jackson the "n-word." The State responded by asserting it had no prior knowledge of Ms. Williamson's testimony. Relying on the State's representation, the trial court denied the motion for mistrial.

After a six-day jury trial, the jury returned a responsive verdict of guilty of manslaughter. Prior to sentencing, Defendant filed a motion for post-verdict judgment of acquittal, which was denied, and the trial court sentenced him to thirty years imprisonment at hard labor with credit for time served. After sentencing, he filed a motion to reconsider sentence that was also denied by the trial court. Defendant appealed his conviction and sentence.

On appellate review, Defendant assigned five errors for this Court's review: (1) there is insufficient evidence to support Garrett Ward's manslaughter conviction; (2) the trial court erred by refusing to grant a mistrial and the repeated injections of racially charged testimony deprived Garrett Ward of his right to due process; (3) the

2

trial court erroneously permitted the introduction of other crimes evidence; (4) the trial court erroneously permitted Detective Haw to testify about blood splatter without being qualified as an expert; and (5) the trial court erred when it imposed an unconstitutionally excessive sentence of thirty years on a first offender. *Ward*, 2023-0524, —— So.3d at ——, 2025 WL 1135095, at *2. This Court determined that there was one error patent as the trial court sentenced Defendant less than twenty-four hours after denying his motion for post-verdict judgment of acquittal. *Id.*, 2023-0524, —— So.3d at ——, 2025 WL 1135095, at *1. We concluded that although the trial court erred in failing to observe the twenty-four hour delay required by La. C.Cr.P. art. 873, the error was harmless because Defendant waived the twenty-four hour sentencing delay when he expressly waived the delay in open court following the denial of his motion for post-verdict judgment of acquittal. *Id.* Additionally, this Court found that there was sufficient evidence to support Defendant's manslaughter conviction, however, the trial court erred in denying Defendant's motion for mistrial. Specifically, this Court "acknowledge[d] that the State solicited a racially charged comment from Ms. Williamson – her testimony that Defendant used a racial epithet during his attack of Mr. Jackson; therefore, the trial court should have granted Defendant's motion for mistrial." *Id.*, 2023-0524, —— So.3d at ——, 2025 WL 1135095, at *9. This Court pretermitted discussion of Defendant's remaining assignments of error; reversed Defendant's conviction and sentence; and remanded the matter to the trial court for a new trial. The State sought review by the Louisiana Supreme Court.

In its writ application to the Supreme Court, the State contended that Ms. Williamson's testimony of Defendant's use of racial epithets during the attack

cannot serve as the basis for a mandatory mistrial. The Supreme Court, in its *per curiam*, granted the State's writ and explained:

> The trial court correctly denied the defendant's motion for a mistrial pursuant to La.C.Cr.P. art. 770(1). The defense sought a mistrial on the basis of purportedly racially-charged comments by an eyewitness during her testimony; however, the witness's challenged statements merely recounted defendant's own words and actions during the charged offense. As such, the references to race were not attributable to the prosecutor, and were in fact material and relevant to establishing the defendant's specific intent to commit the charged offense of second degree murder in violation of La. R.S. 14:30.1 and establishing that the defendant did not act in self defense. Thus, no mistrial was warranted pursuant to La.C.Cr.P. art. 770.
>
> The ruling of the court of appeal, which vacated the conviction and sentence and pretermitted all remaining assignments of error, is reversed. The conviction and sentence are reinstated, and the matter is remanded to the court of appeal for consideration of the pretermitted claims.

*State v. Ward*, 2025-00633, — So.3d at — , — , 2025 WL 2910581, at *1 (La. 10/14/25).

## DISCUSSION

On remand, we address Defendant's remaining assignments of error in regard to his conviction and sentence for manslaughter. For the reasons that follow, we affirm the Defendant's manslaughter conviction and sentence.

***Assignment of Error Number Two: The trial court erred by refusing to grant a mistrial and the repeated injections of racially charged testimony deprived Garrett Ward of his right to due process.***

In addition to Defendant's argument that the trial court erred by refusing to grant a mistrial due to the repeated injections of racially charged testimony, which was rejected by the Louisiana Supreme Court in its *per curiam*, he also asserts that the trial court erred in not granting a mistrial based on the State's failure to provide defense counsel with exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The Defendant's argument

4

concerning the State's failure to provide defense counsel with exculpatory evidence in violation of *Brady* is based on Ms. Williamson's trial testimony that after the attack, Defendant may have stated he was the victim of a robbery. During direct examination, the State asked Ms. Williamson the following:

> At any point in time, any point in time – we can tell by that 9-1-1 call that you're out there for all this -- at any point in time, do you hear Garrett Ward say that he was the victim, or that someone tried to mug him or take his phone or hold a knife or anything like that?

Ms. Williamson responded, "I want to say, he did." During defense counsel's argument in support of his oral motion for mistrial, he utilized Ms. Williamson's testimony to assert that this information – the fact that she may have heard Defendant say he was robbed – is *Brady* material in light of Defendant's asserted self-defense claim, and this information should have been disclosed to the defense prior to trial. The State responded to defense counsel's argument by stating, in part:

> Judge, I'll respond in reverse order. With regards to witness, Kerrie Williamson's statement that yes, she does recall him saying something like maybe, he was robbed, and she laughed at it, because, she knew he was lying about it, because she saw what happened before it happened. And she saw him raise his hand out and ask for some change.
>
> And furthermore Judge, this, is the first time, that she had stated that to the State as well. I met Ms. Williamson today. I asked the question expecting her to say, no. She [didn't] hear Garrett Ward say anything with regards to being robbed. But she said, yes, she heard it and she dismissed it and she laughed at it, because she knew it was not true, because she saw how the incident started. And she was offended by him trying to find some collegiality with her after seeing what he had done. I think if was also in connection with another statement about "you know how these people are always begging us[.]"

In *Brady*, the United States Supreme Court developed the rule that suppression by the prosecution of evidence favorable to the accused violates a defendant's due process rights where it is material either to guilt or punishment, without regard to the good or bad faith of the prosecution. 373 U.S. at 87, 83 S.Ct.

5

1194. "The U.S. Supreme Court has explained that '[t]here are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.'" *State v. Louviere,* 2000-2085, p. 12 (La. 9/4/02), 833 So.2d 885, 896 (citing *Strickler v. Greene,* 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999)). As it relates to the second component – suppression, the record supports the finding that the State did not suppress information regarding Defendant's alleged statement to Ms. Williamson that he was robbed. During the motion for mistrial, the crux of the State's argument was that it had just met with Ms. Williamson the morning of her trial testimony and had no prior knowledge of her testimony that she may have heard Defendant say he was robbed. Even the following day, before the trial court ruled on the motion for mistrial, the State reiterated that it did not know what Ms. Williamson's response would be to the question of whether she heard Defendant say anything about being robbed.

"The Supreme Court has stated that even though the prosecution does not possess or have knowledge of evidence, this does not necessarily absolve the state of its responsibilities under *Brady* because 'the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police.'" *Id.* at p. 13, 833 So.2d at 896 (citing *Kyles v. Whitley,* 514 U.S. 419, 437, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)). The record does not contain any evidence that the NOPD knew that Ms. Williamson may have heard Defendant say anything about being robbed. Predicated on the State's statements to the trial court, under oath, that it had no prior knowledge – personally, as an office, or from the NOPD – of Ms. Williamson's testimony of hearing the

6

Defendant say anything about being robbed, we find that no *Brady* violation exists as the State complied with its discovery obligations.

Additionally, Defendant maintains the State's failure to correct Ms. Williamson's testimony that it should have known was false violated its obligations under *Napue v. Illinois*, 360 U.S. 264, 3 L.Ed.2d 1217 (1959); therefore, a new trial was warranted. "The granting of a new trial based upon a *Napue* violation is proper only if: (1) the statements at issue are shown to be actually false; (2) the prosecution knew they were false; and (3) the statements were material." *State v. Riley*, 2023-0040, p. 22 (La. App. 4 Cir. 8/31/23), 372 So.3d 77, 91 (citing *Napue,* 360 U.S. at 269, 79 S. Ct. at 1177. Defendant avers that much of Ms. Williamson's trial testimony was demonstrably false. Consequently, the State should have known that her claims that he used a racial epithet were untrue especially in light of the fact that her testimony was uncorroborated by any of the other eye witnesses to the attack. Nevertheless, during the motion for mistrial, the State stated that it was unaware of Defendant's alleged use of a racial epithet prior to Ms. Williamson's testimony. The State was not in a position to know whether Ms. Williamson's testimony was false as it heard this testimony for the first time at trial. Moreover, there was no evidence suggesting that Ms. Williamson's testimony was actually false. Accordingly, under *Napue*, we find Defendant was not entitled to a new trial.

Last, Defendant argues the State's failure to provide pretrial notice of his alleged use of a racial epithet heard by Ms. Williamson violated La. C.Cr.P. art. 716. We find this argument to be without merit. Louisiana Code of Criminal Procedure Article 716(B) provides, in pertinent part:

> …[U]pon written motion of the defendant, the court shall order the district attorney to inform the defendant of the existence, but not the contents, of any oral confession or statement of any nature made by the

7

> defendant or any codefendant which the district attorney intends to offer in its case in chief at the trial, with the information as to when, where, and to whom such oral confession or statement was made.

"Louisiana's criminal discovery rules, La. C.Cr.P. art. 716 *et seq.*, are 'intended to eliminate unwarranted prejudice arising from surprise testimony and evidence, to permit the defense to respond to the State's case, and to allow a proper assessment of the strength of the State's case.'" *State v. Hudson*, 2019-0761, p. 8 (La. App. 4 Cir. 4/22/20), 299 So.3d 131, 136-37 (citing *State v. Girard*, 2012-0790, p. 4 (La. App. 4 Cir. 3/6/13), 110 So.3d 687, 690). "Generally, discovery violations do not provide grounds for reversal unless they have actually prejudiced the defendant." *Id.* at p. 8, 299 So.3d at 137(citing *State v. Garrick*, 03-0137, p. 5 (La. 4/14/04), 870 So.2d 990, 993). Again, the State has always maintained the position that it was not aware of Ms. Williamson's testimony regarding Defendant's use of a racial epithet prior to her trial testimony. Because it was not aware of Defendant's alleged use of a racial epithet until Ms. Williamson's testimony, the State could not have provided Defendant with this information prior to trial. As such, the State did not violate La. C.Cr.P. art. 716.

For the foregoing reasons, we find that Defendant's remaining argument under assignment of error two lacks merit.

***Assignment of Error Number Three: The trial court erroneously permitted the introduction of other crimes evidence.***

In his assignment of error three, Defendant asserts the trial court erred in granting the State's motion in limine to introduce evidence of Defendant slapping his girlfriend at the time, Ms. Kelly, shortly before his encounter with Mr. Jackson. A district court's ruling on the admissibility of other crimes evidence will not be overturned absent an abuse of discretion. *State v. Taylor*, 2016-1124, p. 18 (La.

12/1/16), 217 So.3d 283, 296. The introduction of other crimes evidence is governed by La. C.E. art. 404(B)(1), which provides:

> Except as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.

*Res gestae* events constituting other crimes are deemed admissible because they are so nearly connected to the charged offense that the State could not accurately present its case without reference to them. *State v. Taylor*, 2001-1638, p. 10 (La. 1/14/03), 838 So.2d 729, 741. Using *res gestae*, the state completes the story of the crime on trial by proving its immediate context of happenings near in time and place. *Id.* The *res gestae* doctrine is designed to allow the story of the crime to be told in its entirety, by proving its immediate context of happenings in time and place. *Taylor*, 2001-1638, pp. 10-11, 838 So.2d. at 742.

In *State v. Colomb*, 1998-2813 (La. 10/1/99), 747 So.2d 1074, 1076, the Louisiana Supreme Court held:

> The test of integral act evidence is therefore not simply whether the state might somehow structure its case to avoid any mention of the uncharged act or conduct but whether doing so would deprive its case of narrative momentum and cohesiveness, "with power not only to support conclusions but to sustain the willingness of jurors to draw the inferences, whatever they may be, necessary to reach an honest verdict."

The Louisiana Supreme Court cautioned in *Taylor, supra* "even when the other crimes evidence is offered for a purpose allowed under Article 404(B)(1), the evidence must have substantial relevance independent from showing defendant's

general criminal character and thus is not admissible unless it tends to prove a material fact at issue or to rebut a defendant's defense." 2016-1124, p. 12, 217 So.3d at 292. In offering grounds for the admissibility of other crimes evidence, "the state cannot simply rely on a boilerplate recitation" from La. C.E. art. 404(B)(1). *Id*. In ruling on the admissibility of the other crimes evidence, the district court must determine the independent relevancy of that evidence to the charges against the defendant. "The district court must also balance the probative value of the other crimes, wrongs, or acts evidence against its prejudicial effects before the evidence can be admitted." *Taylor*, 16-1124, p. 12, 217 So.3d at 292; *citing State v. Henderson*, 12-2422 (La. 1/4/13), 107 So.3d 566, 567-68.

Defendant contends the trial court erred in finding his argument with Ms. Kelly inside the bar – which resulted in him slapping her in the face – was admissible as an integral act to the subsequent attack of Mr. Jackson because the two incidents are not connected in time. Defendant testified that after his argument with Ms. Kelly, he left the bar; sat outside the Pontchartrain Hotel on a tree planter; gave Ms. Kelly her phone; and fell asleep before his encounter with Mr. Jackson. However, the only evidence of this lapse in time between the argument with Ms. Kelly and Mr. Jackson's attack is Defendant's self-serving, uncorroborated testimony. Ms. Kelly testified that after the argument/slap incident, Defendant left the bar and went outside, and it is undisputed that once Defendant was outside, he encountered Mr. Jackson. The story of Mr. Jackson's attack cannot be told without explaining Defendant's reason for being outside at that moment in time. The argument/slap was an integral part of Mr. Jackson's attack – but for the argument between Defendant and Ms. Kelly, Defendant would not have left the bar when he did and arguably would not have encountered Mr. Jackson.

Moreover, the argument/slap provided a motive for Mr. Jackson's attack. Both Defendant and Ms. Kelly testified that prior to the argument at the bar, Defendant had never put his hands on her in a negative manner, and he was upset by the incident. The slap provided a motive for Defendant's aggressive behavior towards Mr. Jackson.

Finally, the probative value of the slap outweighed any prejudice to the Defendant. The argument/slap provided context for Mr. Jackson's attack – Defendant was outside the Pontchartrain Hotel because he had an argument with Ms. Kelly inside the bar, which resulted in him slapping her in the face. Based on the record, we find no abuse of the trial court's discretion in allowing evidence of the slap to be presented to the jury. Therefore, Defendant's assignment of error three is meritless.

**Assignment of Error Number Four: The trial court erroneously permitted Detective Haw to testify about blood splatter without being qualified as an expert.**

In his assignment of error four, Defendant argues the trial court erred in allowing Detective Charles Haw ("Detective Haw") to provide unqualified expert opinion on blood splatter found at the crime scene. A lay witness "'may draw reasonable inferences from his or her personal observations.'" *State v. Riley*, 2023-0040, p. 14 (La. App. 4 Cir. 8/31/23), 372 So.3d 77, 87 (quoting *State v. D.D.*, 2018-0891, p. 67 (La. App. 4 Cir. 12/27/19), 288 So.3d 808, 855). Further, "[i]t is well-settled that [a] law officer may testify as to matters within his personal knowledge acquired through experience without first being qualified as an expert." *State v. Jackson*, 2015-0809, p. 20 (La. App. 4 Cir. 5/25/16), 193 So.3d 425, 437-38 (citing *State v. Griffin*, 2014-251, p. 21 (La. App. 5 Cir. 3/11/15), 169 So.3d 473, 487). "'The [trial] court is vested with much discretion in determining which opinion

11

testimony shall be received into evidence as lay or expert testimony." *Riley*, 2023-0040, p. 14, 372 So.3d at 87 (quoting *State v. Handy*, 2016-1071, p. 23 (La. App. 4 Cir. 9/13/17), 226 So.3d 1182, 1198 (citations omitted). This Court, in *Riley*, further provided:

> On appeal, a reviewing court must ask two pertinent questions to determine whether the district court properly allowed lay opinion testimony: (1) was the testimony speculative opinion evidence or simply a recitation of or inferences from fact based upon the witness's observations; and (2) if erroneously admitted, was the testimony so prejudicial to the defense as to constitute reversible error."

*Id.* (quoting *D.D.*, 2018-0891, p. 67, 288 So.3d at 855) (citation omitted).

Detective Haw was a NOPD detective assigned to investigate the attack on Mr. Jackson. Detective Haw offered the following testimony regarding the blood splatter at the crime scene:

DETECTIVE HAW:

…I saw the blood splatter up on the fence, which was kinda odd to me, because if somebody is beating someone in a downward direction, how did the blood get up; right….So it was determined that, throughout the investigation, that the – Mr. Jackson was being struck in the head via by foot, or fist, in an upward directions [sic] splattering, hitting his head against the fence, and the iron gate, and making it splatter up.

Detective Haw further expounded on his observations regarding the blood splatter:

DETECTIVE HAW:

The blood I see here, obviously from what I could tell, through my experience, and just common sense, that the blood is hitting up against the gate, and it has enough force to go into the grooves of the iron gate, not just up against the bar, and dripping down.

STATE:

How high was the blood on the gate based on your experience?

DETECTIVE HAW:

It was as tall as I am. Which, I'm not very tall so. I would say anywhere from 5'5", 5'8".

STATE:

Was it blood splatter on the gate?

DETECTIVE HAW:

It was blood splatter on the gate. There was [sic] also pools of blood dripping down, and also splatter, which I've seen on [h]omicides when somebody has been shot. That's just through my experience.

STATE:

So, on homicides, when people have been shot, you've seen blood splatter, but never when beaten to death.

DETECTIVE HAW:

[In] my experience of twenty years, I have never seen blood splatter of that magnitude, just from somebody being hit [by someone's] bare hands.

In this case, Detective Haw's testimony regarding the blood splatter was a reasonable inference drawn from his personal observation of Mr. Jackson's blood on the fence outside the Pontchartrain Hotel. Detective Haw's testimony – that in his twenty-year career, such a large amount of blood splatter was generally associated with a gunshot wound, rather than a beating – was within his personal knowledge acquired through his experience. Therefore, we find the trial did not abuse its discretion in allowing Detective Haw to offer the above-referenced testimony.

Even assuming that Detective Haw's testimony was admitted in error, his testimony was not so prejudicial as to warrant reversal of Defendant's conviction. As stated above, others – Ms. Williamson and Mr. and Mrs. Rainge – witnessed Defendant inflict multiple punches and kicks upon Mr. Jackson. Additionally, Detective Haw and Mr. Jackson's daughter, Kenyada Schnyder (Ms. Schnyder), both of whom visited Mr. Jackson in the hospital, testified that his face was

unrecognizable. This testimony definitely established that the beating was horrendous. Detective Haw's testimony – that the beating consisted of upward punches, resulting in a magnitude of blood splatter generally associated with a gunshot, rather than a beating – was insignificant considering the eye-witness testimony of the incident and testimony about Mr. Jackson's face after the incident. Accordingly, Defendant's fourth assignment of error is meritless.

***Assignment of Error Number Five: The trial court erred when it imposed an unconstitutionally excessive sentence of thirty years on a first offender.***

In his final assignment of error, Defendant maintains that the imposition of a thirty-year sentence for manslaughter is excessive. Defendant argues that the evidence does not support the imposition of the sentence. As such, he argues that the trial court erred in denying his motion to reconsider sentence.

Under the Eighth Amendment of the United States Constitution and Article I, §20 of the Louisiana Constitution, the imposition of excessive and cruel punishments are prohibited. *State v. Wilson*, 2014-1267, p. 23 (La. App. 4 Cir. 4/29/15), 165 So.3d 1150, 1165. "The excessiveness of a sentence is a question of law, and a reviewing court will not set aside a sentence [for excessiveness] absent a manifest abuse of discretion by the trial [judge]." *State v. Alridge,* 2017-0231, p. 39 (La. App. 4 Cir. 5/23/18), 249 So.3d 260, 288, *writ denied,* 2018-1046 (La. 1/8/19), 259 So. 3d 1021. "The trial judge is afforded wide discretion in determining sentences, and the court of appeal will not set aside a sentence for excessiveness if the record supports the sentence imposed.'" *State v. Bradley*, 2018-0734, p. 8 (La. App. 4 Cir. 5/15/19), 272 So.3d 94, 99-100 (quoting *State v. Williams*, 2015-0866, pp. 12-13 (La. App. 4 Cir. 1/20/16), 186 So.3d 242, 250); *see also* La. C.Cr.P. art. 881.4(D). Although a sentence is within the applicable statutory range, a sentence may be

deemed unconstitutionally excessive if the reviewing court determines that the sentence does not serve to complete the acceptable goals of punishment, constitutes purposeful imposition of pain and suffering, and is disproportionate to the severity of the offense committed. *See State v. Kennon*, 2019-0998, 2020 WL 5405710, at * 5 (La. 9/1/20), —— So.3d ——, —— (citing *State v. Dorthey*, 623 So.2d 1276 (La.1993); *State v. Johnson*, 709 So.2d 672 (La. 1998)). Therefore, "[t]he relevant question is whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate." *State v. Mathieu*, 2018-964, p. 4 (La. App. 3 Cir. 11/6/19), 283 So.3d 1041, 1045 (*citing State v. Cook*, 95-2784 (La. 5/31/96), 674 So.2d 957). We will review this matter to determine whether the sentences imposed are grossly disproportionate to the severity of the crime committed and whether the trial court abused its vast discretion in imposing Defendant's sentences.

When reviewing a claim that a sentence is excessive, our Court must determine whether the trial court adequately complied with the statutory guidelines in La. C.Cr.P. art. 894.1 and whether the facts of the case warrant the sentence imposed. *State v. Rouser*, 2014-0613, p. 18 (La. App. 4 Cir. 1/7/15), 158 So.3d 860, 872 (citation omitted). "If adequate compliance with La. C.Cr.P. art. 894.1 is found, the reviewing court must determine whether the sentence imposed is too severe in light of the particular defendant and the circumstances of the case...." *Id*., 2014-0613, p. 18, 158 So.3d at 872-73.

An examination of the record reflects that the trial court complied with La. C.Cr.P. art. 894.1 regarding Defendant's sentencing for manslaughter. Both the State and Defendant were afforded the opportunity to be heard regarding his sentence, and Defendant and his parents testified at the sentencing hearing. Additionally, the trial

court took into consideration mitigating and aggravating circumstances to sentencing. Specifically, the trial court explained:

So, the Court would like to start off with the sentencing guidelines which are under Code of Criminal Procedure, Article 894.1. And I particularly want to start there because in the defense's sentencing memorandum, they have provided to the Court, several mitigating factors including trying to go back to what was or was not proven to the trier of fact during the trial. But I'm going to take it further because I was present during the trial, and go on to those mitigating [factors] that are listed under Article 894.1.

So, in particular, the defense says that one mitigating factor that this court should consider is that the defendant has no history of prior delinquency, or criminal activity, or has led a law abiding life for a substantial period of time before the commission of the crime, which is specifically under [Article 894.1(28)]; and the Court has taken that into consideration. And it has taken into consideration that for the past four-years, or four and a half years while this case has been pending before me, this court has found that there has not been any further criminal activity by the defendant.

In addition, the defense has included a mitigating factor which is listed [in] Section 29 under Article 894.1, which is defendant's criminal conduct was the result of circumstances unlikely to reoccur. And they specifically indicate that this is evident from both the way Mr. Ward has acted during the pendency of the case while out on bond, as well as from the substantial strides he has made in his sobriety and mental health from the date of [the] incident until today. And so, the Court has taken that into consideration.

In addition, they state or they cite Section[s] 30 and 32 [of Article 894.1], which read respectively, "The defendant is particularly likely to respond affirmatively to probationary treatment," and then 32, "The defendant has voluntarily participated in a pre-trial drug testing program," as you've already heard me discuss that. And it goes on to talk about Mr. Ward's family and work life, and about him being remorseful for his events.

And so now the Court wants to go over some aggravating factors that the Court finds should be stated for the record, as well. One, the Court believes that the sentence that will be imposed, that any lesser sentence would basically deprecate the seriousness of the defendant's crime. The Court believes that the offender's conduct during the commission of the offense manifested deliberate cruelty to the victim. Seeing the age, and the fragileness of Mr. Jackson, I truly believe that that is an aggravating factor.

16

In addition, the Court believes that the offender knew or should have known that the victim of this offense was particularly vulnerable, or incapable of resistance due to his advanced age, size, and absolutely a big difference in weight, and other factors comparing Mr. Ward to Mr. Jackson. He was absolutely vulnerable to Mr. Ward.

In addition, the Court wants to point out that the offender used actual violence in the commission of the offense. Although it may not have been a weapon, his weapon were [sic] fists.

Subsequent to the offense, and I'm going little by little down the sentencing guidelines, the offender used, as I said before, violence and force on this victim, Mr. Jackson. The offense resulted in a significant, permanent injury to the victim, or his family. In this case it was both. It resulted in his death.

And so, those are a few of the aggravating factors that the Court has considered in this matter along with the defense's mitigating factors….

In this case, the record supports the thirty-year sentence imposed on the Defendant. Defendant brutally attacked Mr. Jackson, ultimately resulting in his demise. Although Defendant claimed he acted in self-defense, none of the evidence supported his claim or the fact that this beating was somehow justifiable. None of the witnesses to the attack saw Mr. Jackson with a knife, and a no one found a knife in the area where the attack occurred. Moreover, the injuries to Mr. Jackson's head were so severe that when Detective Haw and Ms. Schnyder visited Mr. Jackson in the hospital, they testified that his face was unrecognizable.

A presentencing investigation report was requested in this matter, which recommended a sentence of ten to twenty years. However, the trial court observed that this report is not binding on the court. Additionally, the trial court voiced its disappointment in Defendant's testimony at sentencing and expressed:

> [T]he most important part of everything you said was that you believed, or rather what the Court gathered is that you believe that you were defending yourself. As I said earlier, the reason why I denied the defense's Motion for Post-Verdict Judgment of Acquittal is that the evidence adduced at trial did show the trier of fact that you were guilty of manslaughter of Arnold Jackson.

I did not say that you were not. I did not say that it showed the jurors that you were defending yourself because that is not what the verdict reflects. And so, I sit here concerned about the fact that Mr. Ward, members of the family, friends of the family still believe to this day that there was justification, but that is not the evidence that was adduced at the trial.

The court further stated:

I so wish I would have heard a different Garrett Ward in the sense not justifying your behavior on that unfortunate night.

Based on the record, we find adequate evidence that the trial court complied with the statutory guidelines in La. C.Cr.P. art. 894.1 and find that the trial court did not abuse its discretion in sentencing Defendant to thirty years imprisonment for the manslaughter conviction. Accordingly, Defendant's assignment of error five is without merit.

## CONCLUSION

For the foregoing reasons, we affirm the Defendant's manslaughter conviction and sentence.

**AFFIRMED**