809 So.2d 1112 (2002)
STATE of Louisiana
v.
Raynell BRIGHT.
No. 2000-KA-1255.
Court of Appeal of Louisiana, Fourth Circuit.
February 6, 2002.
Harry F. Connick, District Attorney, William L. Jones, III, Assistant District Attorney, New Orleans, LA, for Plaintiff/Appellee.
*1113 Sherry Watters, Louisiana Appellate Project, New Orleans, LA, for Defendant/Appellant.
(Court composed of Judge MIRIAM G. WALTZER, Judge MICHAEL E. KIRBY, Judge DAVID S. GORBATY).
Judge MIRIAM G. WALTZER.

STATEMENT OF THE CASE
On 15 June 1995, the defendant was charged by grand jury indictment with the first degree murder of his daughter, a child under twelve years of age, in violation of LSA-R.S. 14:30. He was arraigned 21 June 1995, and pled not guilty, and on 17 July 1995, he changed his plea to not guilty and not guilty by reason of insanity. He was found competent to proceed to trial, following which, on 29 April 1998, a twelve member jury found him guilty as charged, but could not reach a decision on his sentence. On 1 June 1998, he was sentenced to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. He filed motions for new trial and for post verdict judgment of acquittal which were denied. He filed a motion for appeal pro se on 19 August 1998.

ERRORS PATENT:
We have reviewed the entire record for errors patent and have found none.

STATEMENT OF FACTS:
The murder charge stems from an incident that occurred on 16 April 1995, when the defendant burst into the house of his former girlfriend's mother, and shot and killed their six month old daughter, Sade.
Deputy John Meyer testified that on 23 December 1994, the defendant appeared at Children's Hospital to see Sade who was a patient. Meyer was called to end a disturbance in the hall between the child's mother, Cheryl Tomkins, and the defendant. The two were yelling and screaming at each other so loudly the defendant had to be escorted out of the hospital. As he left the front door, he said to Tomkins, "I'm going to get you, bitch." Tomkins was frightened and felt the defendant would carry out the threat.
Officer Byron Winbush said he examined the bullet found in the autopsy, sixteen casings found at the scene, and three bullets found at the scene. All had been fired from the gun recovered from the defendant. He explained that in order for the gun to fire, the defendant's finger would necessarily have been on the trigger.
Officer Glenn Major said that he and Officers Peggy Martin, Clifford Nealy, and Willie Jones responded to the call. An irate woman outside the house said that the defendant had shot the baby and was in the house. The officers entered and heard a female voice from the second floor ask who was downstairs. The officers answered, "police." At the top of the stairs, Officer Major saw the defendant with his arm extended, holding the gun. The defendant fired three or four shots in the direction of the officers. Martin confirmed Officer Major's testimony.
Tomkins said she broke off her engagement to the defendant in January 1994, found out that she was pregnant in March 1994, and delivered baby Sade in October 1994. In December 1994, she put the baby in the hospital where the child was treated with antibiotics. Up until that point, she and the defendant were getting along. She called the defendant's mother to tell him the baby was in the hospital. The defendant came to the hospital and spent the night. They talked again the next day. On the third day, the defendant called her and accused her of not telling him what was happening with the child's health. He told her over the phone: "Mama bitch, I'm gonna kill you." Tomkins was frightened because the defendant had never threatened *1114 her before. She reported the threat to the police, and the police advised her to leave the hospital room when the defendant returned to the hospital. He arrived at the hospital, and started yelling at her that she had not called him soon enough. An argument erupted. Tomkins told the defendant that she did not want to argue because the child was sick. She attempted to go to the lobby. The defendant followed her, yelling at her that they needed to talk. She told him that they had nothing to discuss and to go visit the baby. The argument worsened, security arrived, and the defendant was escorted out of the building. As he was leaving through the front door, he yelled, "I'm gonna get you bitch."
Tomkins's mother advised her that she was in danger and should move in with her, so Tomkins did so. The defendant continued to call and threaten her and came to the house screaming. She spoke to police, and a court date was set.
The jury also heard evidence that the defendant had kicked in Tomkins's door on one occasion, and that she had broken off her engagement with him when he stole her car.
On the night of the crime, Tomkins testified that she did not know the defendant was in the house until he burst into her bedroom where she was lying on a bed with the child. The defendant pushed her on the bed, lay the baby on its back, and shot her in the chest. Tomkins's sister Koranda appeared in the room and punched the defendant in the head. He dropped the gun. Koranda ran out of the room with the child, and Tomkins did not realize that the baby was dead. Tomkins began wrestling with the defendant for the gun. He told her that he had come to kill the child, kill her and then kill himself so that the three of them could be together in heaven. Tomkins assumed she would die. The defendant told her that if he botched the killings, he had paid the "Bally Boys" to commit the murders. Tomkins said she wanted to go check on the child, and the defendant told her that he was sure that she was dead because he had shot her in the heart. Karonda then came back into the room and told the defendant that he had killed the child.
The police arrived, and the defendant began shooting at the officers. At one point, the defendant reloaded the gun. The police attempted to talk to him. He told Tomkins to get him a cigarette lighter or he would kill her. He asked to speak to his parents. He continued firing out of the window. Then he told Tomkins that he loved her and that they could still be a family. At that point, Tomkins realized that he would not kill her. He asked about what had gone on in church that day, which was Easter Sunday. He said he knew that he had "messed up." He continued firing the gun. He asked Tomkins to kiss him and then to take off his shirt. He remarked that he remembered her smell. Tomkins then convinced him that she had never lied to him, and that if he would give her the gun, she would get him a cigarette lighter and convince the police not to kill him. She convinced him that if he pleaded insane to the crime, he could "get off" just as the president's attempted assassin had done. She took a cigarette from him and went downstairs and lit it. The police told her to leave, but she ran back into the room with the defendant. She then convinced him that because she had kept her word to him that she would bring him a cigarette, he should give her the gun. Eventually he did, and the two came downstairs. Tomkins threw the gun onto a sofa. The defendant then pulled her back onto a chair and held her in a choke hold. A S.W.A.T. team arrived and pulled the defendant off of her. She ran into the front yard and collapsed. The police put the defendant in the car, and he *1115 began to try to kick out the windows. He had to be restrained. Then the officers told Tomkins they were taking her to homicide, and she realized that her child was dead.
The defense called Dr. Sarah Deland[1], psychiatrist, who said she examined the defendant in September 1995 and July 1977. She said that she found the defendant competent to proceed to trial, but that he was suffering from depression, and she prescribed Zoloft. She said she also examined Charity Hospital records from September 1994 when the defendant appeared after a dispute with a relative and was intoxicated. He might have stayed over night. She said that alcohol and depression interact over time. She quoted from a note on his record: "At the time of the alleged offense, Mr. Bright was functioning well enough to maintain his own apartment, and maintain employment, although he did change jobs frequently. His action on the date of the incident do not suggest confusion, or difficulty in reasoning, as would be expected if he were suffering from a serious mental illness." She testified that at the time of the offense he could distinguish right from wrong. A scan of his brain showed that it was normal.
Gerilyn Butler, Rebecca French, and Noel Mitchell, all family friends, said the defendant cared about Sade.
Celephin Bright, the defendant's sister, said the same thing, and said the defendant had quit drinking when the child was born. She said his depression worsened. On the day of the crime, he had been drinking for two days. She said he told her he was going home about 9:30 p.m.
Deanna Jackson, managing attorney for the New Orleans Legal Assistance Corporation, said the defendant had sought help to obtain visitation rights.
The defendant took the stand, but his direct testimony is missing from the record. On cross-examination, he testified that he went to the home of Tomkins's mother with the gun. He knocked on the door, and while the mother was answering the door, Koranda appeared. He went into the house. Koranda ran upstairs and was holding the baby. The defendant grabbed for the child, and the gun went off accidentally. He did not know whether he had hit the child. He admitted he took nothing when he went to the house but the gun and bullets. He admitted he had been stupid. He said the shooting was an accident. On re-direct examination, he testified as to how much he loved the child. On re-cross-examination, he denied being jealous of Tomkins.
On rebuttal, the State called Dr. Hermander Mallik[2], psychiatrist, who said he examined the defendant on 20 January 1998. He said he examined documents including the newspaper account of the story, the police report, a report from security at Children's Hospital, letters written to Tomkins written 18 July 1995 and 25 July 1995, the reports of Drs. Richoux and Deland, medical records from Charity Hospital dated 2 September 1994, letters from the defendant in prison, the defendant's school records, a CT scan report done on the defendant, a telephone interview with Tomkins dated 14 January 1998, and telephone interviews with Major, Mrs. Guice (the child's grandmother), and Koranda. The prosecution asked: "Now, in the course of your evaluation, clinically did you reach an opinion as to his criminal responsibility?" The doctor responded: "In my opinion to a reasonable degree of medical certainty, Mr. Bright does suffer a *1116 disorder which is known as alcohol abuse, which is in remission now because of him being in a controlled environment, but however, this mental disorder did not in any way cause him to be incapable of distinguishing right from wrong. In reference to the events that occurred back on April 16, 1995."
The doctor also gave a diagnosis of personality disorder with anti-social traits. He said the defendant was not schizophrenic and was not on psychotropic drugs. He showed no signs of retardation. The doctor said the defendant seemed much more concerned with his relationship with Tomkins than he was with his relationship with the child.
FIRST ASSIGNMENT OF ERROR: The defendant was denied his right to an appeal and his constitutional right to effective assistance of counsel on appeal because the record lacks necessary transcripts.
This argument is strengthened by the fact that appellate counsel was not the same as trial counsel.[3]
The state constitution provides that "[n]o person shall be subjected to imprisonment... without the right of judicial review based upon a complete record of all evidence upon which the judgment is based." La. Const. Art. I, § 19. In felony cases, the recording of "all of the proceedings, including the examination of prospective jurors, the testimony of witnesses, statements, rulings, orders, and charges by the court, and objections, questions, statements, and arguments of counsel" is statutorily required. La.C.Cr.P. art. 843.
In State v. Ford, 338 So.2d 107 (La. 1976), the Louisiana Supreme Court held:
Without a complete record from which a transcript for appeal may be prepared, a defendant's right of appellate review is rendered meaningless. A slight inaccuracy in a record or an inconsequential omission from it which is immaterial to a proper determination of the appeal would not cause us to reverse defendant's conviction. But where a defendant's attorney is unable, through no fault of his own, to review a substantial portion of the trial record for errors so that he may properly perform his duty as appellate counsel, the interests of justice require that a defendant be afforded a new, fully-recorded trial.
338 So.2d at 110.
In Ford, the court found the omission of the testimony of four State witnesses, voir dire, and opening statements made it impossible for counsel, who was appointed for the appeal, to adequately review the record for errors.
In State v. Diggs, 93-0324 (La.App. 4 Cir. 6/29/95), 657 So.2d 1104, this court found the unavailability of an officer's complete testimony necessitated a new trial. This court held that this omission necessitated a new trial because it could not be determined whether the missing testimony was substantial or inconsequential, or whether any objections or motions had been made during the officer's testimony.
However, this court has recognized that a complete appellate review of a defendant's conviction and sentence can be accomplished on occasion when there are missing portions of the trial record. In State v. Thomas, 92-1428 (La.App. 4 Cir. 5/26/94), 637 So.2d 1272, this court found that the record was adequate for full appellate review. Missing from the appeal record were transcripts of the voir dire, jury instructions, opening statements, and closing arguments. The court noted that "[b]ecause the missing portions of the trial *1117 record are not evidentiary, their absence does not compromise the defendants' constitutional right to a judicial review of all evidence." Thomas, at 1274. In addition, the minute entries of trial did not indicate that the defendant made any objections during the proceedings missing from the record.
Also, in State v. Lyons, 597 So.2d 593 (La.App. 4 Cir.1992), this court concluded that the appellate record was adequate for review although transcripts of the voir dire, the impaneling of the jurors, opening statements, and a portion of the jury charges were missing. The court noted that the defendant had made no specific assignments of error as to the missing portions of the record except the fact that they were missing.
In neither case was material witness testimony missing from the record. The instant case presents a very difficult situation. The defendant argues correctly that the transcript contains many mistakes and omissions. The transcript does not present the testimony in the order it was presented at trial. At one point a huge section of the transcript is repeated. There are many mistakes in spelling. Names are reported incorrectly. There is no testimony at all from the coroner's office, and although it is apparent from the minute entry and the transcript that a forensic pathologist did testify, it is not clear which forensic pathologist testified or what he or she said. The transcript lacks the testimony of Theresa Lamb, criminalist. It lacks the entire testimony of Koranda Guice, who was holding the baby when she was shot, and Mrs. Guice, in whose home the incident took place. Significantly, as well, the record lacks the direct testimony of the defendant.
That the transcript does not present the witnesses in order and that it contains misspellings is not troubling. The order of the witnesses can be gleaned from the minute entry of trial, and the misspellings are not so severe as to render the transcript unreadable. The missing testimony of some of the witnesses also does not appear to be an insurmountable obstacle for this court. Like Diggs, we must reverse because it could not be determined what was in the missing excerpts. We cannot determine whether the missing evidence was not crucial to the defense or could be gleaned from other sources. This court cannot review whether the defense conducted a thorough cross-examination of the "missing" witnesses. We cannot conclude on the record before us that the defense was unable to establish internal inconsistencies in their stories, or aspects of their stories that were inconsistent with the testimony of the other witnesses.
The fact that the direct testimony of the defendant is not available for review is perhaps the most troubling. The cumulative effect of the missing portions of testimony of the defendant and other material witnesses, and the frequency of "inaudible" and "spelled phonetically" in the transcript that is available for review denies appellate counsel and the defendant a meaningful opportunity to review the trial proceedings. We are aware of the age of the case, the horror of the crime, and the strong evidence presented by the State. However, in light of the defendant's constitutional right to a full transcript of his own testimony and that of several material witnesses, we have reached the painful conclusion that through the inadequacy of the trial court's transcription procedure, the defendant is entitled to a new trial.
The remaining assignments of error are moot.

CONCLUSION AND DECREE
For the foregoing reasons, the conviction is reversed, the sentence is vacated and the case is remanded to the district *1118 court for further proceedings consistent with this opinion.
CONVICTION REVERSED; SENTENCE VACATED; CASE REMANDED.
NOTES
[1] The transcript incorrectly states "Sarah Gelland.".
[2] The transcript incorrectly states "Harminder Mallard."
[3] Trial counsel's theory of the case contained in a motion for a post verdict judgment of acquittal summarized some of the testimony and is in the record.