Judge Dale N. Atkins
Defendant, Clifford Williams ("Defendant") appeals his conviction by a jury of second degree murder, a violation of La. R.S. 14:30.1, and his resulting life sentence without benefit of parole, probation or suspension of sentence. Finding no merit to his assignments of error on appeal, we affirm his conviction and sentence.
Procedural Background
On July 18, 2013, the State indicted Defendant for the March 25, 2013 second degree murder of fifteen-year-old Ralphmon Green ("victim"). Defendant pled not guilty at his arraignment on July 26, 2013. On August 26, 2014, the trial court denied Defendant's motions to suppress identification and statement.
Following numerous continuances, trial commenced on January 24, 2017, and concluded January 26, 2017, with the jury returning a verdict finding Defendant guilty of second degree murder. Defendant filed motions for post-verdict judgment of acquittal, new trial, and to reconsider sentence on March 28, 2017, all of which were denied on May 17, 2017. Immediately after denying those motions, the trial court sentenced Defendant to life imprisonment without benefit of parole, probation or suspension of sentence.
Defendant's motion for appeal was granted on May 17, 2017 and his appeal was timely filed.
Evidence at Trial
At trial, Officer Juan Lopez ("Officer Lopez") testified that he was the responding officer to a report of aggravated battery *908 by shooting in the 2100 block of Allen Street, in New Orleans on March 25, 2013. He found the victim lying on his back on the ground, unresponsive and with a gunshot wound to the head. Officer Lopez stated that there was a large crowd of people around the victim and that no weapon was found on the victim or on the scene near the victim.
Sheryl Green ("Ms. Green"), the victim's mother, testified that on the day her son was killed, her son had left home on his bicycle to go to her niece and nephew's house a short distance away. She reported that she learned her son had been shot when she received a phone call from Durrell Williams ("Durrell"), a friend of the victim's. Later that evening, she was visited by Durrell's mother, Tina Williams ("Ms. Williams") and Carl "Monster" Moore ("Mr. Moore"), who were both acquainted with her son. Both Ms. Williams and Mr. Moore stated that they witnessed her son get killed. Ms. Green identified an Instagram photograph that she provided to New Orleans Police Detective Travis Ward ("Det. Ward"). She had suggested Det. Ward use the photograph to investigate the man depicted in the middle of the photograph. She told Det. Ward the man in the photograph attended Clark High School.
Det. Ward, the lead detective on this case, recalled that the shooting occurred on March 25, 2013, at approximately 6:15 p.m. By the time Det. Ward arrived on the scene, the victim's body had been removed to University Hospital. Det. Ward identified photographs of the crime scene. Eight 9-millimeter shell casings were located at the scene, along with four bullets, three of which had been fired into the ground and the fourth, which was located and removed from a car parked near the scene. Additional bullets were later retrieved from the body of the victim. Det. Ward explained that the location of the bullets on the scene was important because they indicated that the shooter was firing down at the victim multiple times and at a distance.
Det. Ward separately interviewed Ms. Williams, Durrell, and Mr. Moore. Ms. Williams confirmed that she had witnessed the shooting. Ms. Williams, Mr. Moore and Durrell all described the shooter as having a medium build, "bright" skin with a small or thin beard. Det. Ward reported that none of these witnesses could provide him with the suspect's name. All three denied that the victim was armed at the time of shooting or that the victim did anything to indicate that he was armed at the time of the shooting. Det. Ward also testified that none of the witnesses on the scene reported that the victim had been armed with a firearm when he was killed. Det. Ward was unable to retrieve surveillance video of the area.
Further investigation revealed that the suspect was known as "Cliff" and that he attended Clark High School. School personnel identified the image of the suspect from the Instagram photo as Clifford Williams (Defendant). School personnel gave Det. Ward a high school picture of Defendant along with a biographical information sheet.[1]
Det. Ward compiled a six-person photo lineup, which included Defendant's high school picture, and he showed the photo line-up to Ms. Williams. Ms. Williams identified Defendant as the shooter. Det. Ward *909 then obtained an arrest warrant for Defendant and a warrant to search Defendant's residence. On April 2, 2013, Det. Ward executed both warrants. During the course of the search, Det. Ward confiscated a pair of blue jeans hidden under the sofa where Defendant usually slept. In the pocket of the blue jeans, Det. Ward found a semi-automatic Smith and Wesson gun. Det. Ward explained that the confiscated weapon could hold sixteen rounds of ammunition but was loaded with just eight bullets. Det. Ward reported that the weapon was submitted to the crime lab to be tested to see if it was the same weapon used to fire the shell casings that were collected at the crime scene.
According to Det. Ward, Defendant was transported to police headquarters, where he was given his rights per Miranda .[2] Defendant gave an audio and video-recorded statement, which the State played in court as the jury followed along with a transcription of the statement. Initially, Defendant denied being present at the shooting, and claimed he did not know the victim. Confronted with the evidence against him, however, Defendant admitted shooting the victim. Defendant claimed that he and the victim were engaged in a verbal exchange when the victim appeared to quickly reach for a gun. Defendant drew his gun, which was concealed in his waistband, and shot the victim, claiming "he was about to kill me."[3] Defendant explained that he left the scene of the shooting and rode a city bus to his father's house.
Continuing his testimony, Det. Ward said his investigation revealed that a person named Ernest Cloud was present at the shooting and had encouraged Defendant to shoot the victim. Det. Ward learned that Ernest Cloud was on probation and was wearing an ankle monitor at the time of the shooting. Further, Det. Ward learned that the ankle monitor indicated Ernest Cloud was present in the area at the time the victim was shot. Det. Ward identified Ernest Cloud as the individual wearing white in the Instagram photo. When he gave his statement, however, Defendant denied that anyone named Ernest was with him at the time of the shooting.
On cross-examination, Det. Ward testified he learned the victim had been on the scene for a period of time prior to the shooting and that the shooting resulted from a dispute between the victim and Defendant that had begun about a month and a half prior to the victim's murder. Det. Ward learned during his investigation that, just before the shooting, six black males arrived in response to a phone call made by "Dominique." Among those six males were Mr. Moore, "Tigger," "Jermaine" and "Ruger," who were the victim's friends and who were believed to be members of the "Money Over Everything" gang. On redirect, Det. Ward indicated that gang members often denote their loyalty to a gang by getting tattoos on their hands, similar to those on Defendant's hands. Det. Ward further explained that gang members generally wage disputes with other gang members but the victim in this case was not known to be a member of any gang.
The State called Mr. Moore, who acknowledged currently being in jail for home invasion and having prior convictions of burglary and theft. Mr. Moore stated that he did not want to appear in court for fear of being labeled a "rat" and possibly *910 killed. However, he agreed to testify because of his close relationship with the victim and because the victim's family deserved justice.
Mr. Moore acknowledged that he knew Ms. Williams and her son Durrell; however, Mr. Moore knew Durrell by the name of "Ruger." Just prior to the shooting, Ms. Williams received a telephone call asking her to drive to the 2100 block of Allen Street because, "Durrell was about to get into it with someone." Mr. Moore accompanied Ms. Williams to Allen Street where they saw the Defendant pointing a gun at the victim, with whom he was arguing. Mr. Moore positioned himself between the victim and Defendant, urging Defendant to put the gun down because "... it's not worth it... That's a little boy (referencing the victim) right there, man." According to Mr. Moore, the victim was unarmed when the gun was pointed at him, and he made no gesture or movement to indicate that he was armed. Defendant lowered his weapon, momentarily pointing it at the ground. At that point, someone with Defendant said: "Get at him [the victim]. You need to get at him." Defendant then started shooting at the victim. After the first shot, the victim fell down. Defendant continued to fire multiple shots at the victim and then ran away. Later that evening, Mr. Moore visited the victim's mother and told her he was present when the victim was shot. The next day, Mr. Moore gave a full recorded statement to the police.
The State called Durrell, who emphatically stated he did not want to testify in this matter. However, Durrell testified that he and the victim were friends and attended school together. On the day of the shooting, Durrell was with "Tigger" and "Nice" in the Seventh Ward when the victim told him that he (the victim) was "mean mugging" (making facial expressions) with somebody at the apartment complex. Durrell returned to the apartment complex pursuant to the victim's request. When Durrell arrived at the complex, he saw the victim arguing with Defendant. Shortly after, Durrell's mother, Ms. Williams, drove up to the complex with Mr. Moore and ordered Durrell to get into the car. He refused to comply. Defendant retrieved a gun from a car and pointed it at the victim. Durrell testified that Mr. Moore stepped in front of the victim to defuse the situation and Defendant lowered his gun. The victim said: "He brought that whole gun out here but he's not going to use it." One of Defendant's friends urged Defendant to "get at the [victim]." Defendant began shooting the victim and continued to shoot as the victim fell to the ground. Defendant then ran away. Durrell said that neither he, the victim nor Mr. Moore were armed at the time of the shooting. A few days after the shooting, he gave a statement to the police.
Ms. Williams testified that, on the day of the shooting, Durrell and the victim were together on Allen Street. Ms. Williams received a telephone call from her friend informing her that Durrell and "others" were arguing at the apartment complex in the 2100 block of Allen Street. Ms. Williams and Mr. Moore drove to the complex. Ms. Williams told Durrell and the victim to get into her car; however, they did not do so. Someone drove up and handed something to the person the victim had been arguing with. That person walked back to the victim and pointed a gun at him. At that point, Mr. Moore stood in front of the victim and convinced the gunman to lower his weapon. As Mr. Moore and Durrell had testified before her, Ms. Williams stated that someone urged the gunman to shoot, he shot the victim multiple times, even after the victim fell to the ground, and then the gunman ran away. Ms. Williams called 911. She testified that *911 the victim, Mr. Moore and Durrell were unarmed at the time the shooting started. Ms. Williams also testified that the victim did not make any gesture to suggest he had a gun. After witnessing the shooting, Ms. Williams went to the victim's mother's house, told her that the victim was shot by "Cliff" and gave the victim's mother an Instagram picture of "Cliff." Ms. Williams spoke to the police and identified Defendant as the gunman from a photo lineup shown to her.
Dr. Michael Defatta, the State's expert in forensic pathology, performed an autopsy on the victim's body and rendered a report of his findings. Dr. Defatta noted that the victim suffered four gunshot wounds - one each to his right arm, head, right chest and left leg. The fatal wounds were to the victim's head and chest.
Sgt. Mark Boudreaux, the State's firearm expert, testified he received a 9-millimeter weapon and eight 9-millimeter casings for testing. Boudreaux test fired the 9-millimeter weapon. He compared the rounds he test-fired to the eight 9-millimeter casings obtained from the crime scene and the victim's autopsy. He concluded that the all of the 9-millimeter casings he received were fired by the same gun, and that the gun was the same 9-millimeter weapon confiscated from Defendant.
The defense recalled Det. Ward, who confirmed that he took a statement from Durrell on March 29, 2013, during which Durrell said his nickname was "Ruger." Det. Ward stated that a "Ruger" was, to his knowledge, a type of firearm. He also remembered Durrell referring to guns as "burners." On cross-examination, Det. Ward clarified that Durrell's statement indicated three guns were on the scene of the shooting - the weapon used by Defendant, and the guns Durrell believed were in the possession of two of Defendant's associates. Det. Ward reaffirmed that Durrell never stated that he, Mr. Moore, or the victim were armed at the time of the shooting.
The next defense witness was Lamont Anderson ("Mr. Anderson"), who admitted to currently being incarcerated. Mr. Anderson recounted the events of March 23, 2013, stating that when he came home from school that afternoon, he and someone named "Dominique" got into an argument. Defendant stepped in to de-escalate the argument. Dominique and Defendant then walked away. Dominique then called the victim who arrived on the scene and began arguing with Defendant because he thought Defendant was the person who had argued with Dominique. The victim threatened Defendant and called him names. The victim then "went to reach - went to get a gun from Dominique." The victim clutched the gun in the waistband of his pants. When the shooting started, Mr. Anderson ran inside. He admitted he did not witness the actual shooting. Mr. Anderson also conceded that his sister and Defendant were involved in a dating relationship.
On cross-examination, Mr. Anderson stated that he was currently in jail with Defendant. Mr. Anderson said he lied when he told the district attorney on multiple occasions and told the detective right after the shooting that he did not see the victim at all on the day of the shooting. He also admitted he never told the detective that he saw the victim clutching a gun. Mr. Anderson stated that he was inside for some minutes "talking, fussing" with his mother before he heard the gunshots. He stated that he never saw any firearms on the day of the shooting. Instead, he said he only saw the victim holding the waistband of his pants. However, during further questioning, Mr. Anderson once again stated he saw "Dominique" give the victim a gun. However, Mr. Anderson stated Dominique *912 gave a gun to the victim a few minutes before the shooting, when he got home "around three o'clock" in the afternoon. The prosecutor established that Mr. Anderson was wrong about the time frame as the victim was actually shot about three hours later. The prosecutor also impeached Mr. Anderson with a statement he made to the jury that he had not spoken to Defendant in a month, yet in a phone call from jail, Mr. Anderson stated he spoke to Defendant a couple of days before the trial.
Errors Patent
A review of the record reveals one patent error. Defendant's motion for new trial was denied on May 17, 2017, after which the trial judge immediately sentenced Defendant.
La. C.Cr.P. art. 873 states, in pertinent part, that if a motion for new trial is filed, sentence shall not be imposed until at least twenty-four hours after the motion is denied, unless the defendant expressly waives the delay. "[T]he failure to observe the twenty-four-hour delay mandated by Article 873 is harmless where the defendant does not complain of his sentence on appeal." State v. Duncan, 2011-0563, p. 8 (La. App. 4 Cir. 5/2/12), 91 So.3d 504, 511.
In the instant case, the record does not indicate that Defendant waived the twenty-four-hour delay, and, Defendant does raise, in his fourth assignment of error, the claim that his sentence is unconstitutionally excessive. Nevertheless, "[a]bsent a showing that prejudice resulted from the failure to afford the statutory delay, reversal of the prematurely imposed sentence is not required." State v. Hutsell , 2017-0112 (La. App. 4 Cir. 4/18/18), 241 So.3d 542, 551 (citing State v. Seals , 1995-0305, p. 17 (La. 11/25/96), 684 So.2d 368, 380 ). No prejudice can be found when the sentence imposed was mandatory because "[d]elay or no delay, the sentence the judge was required to impose would have been the same." Seals , 1995-0305 at p. 17, 684 So.2d at 380.
In the case sub judice , Defendant was convicted of second degree murder which mandates a sentence of life imprisonment without benefit of parole, probation or suspension of sentence. See La. R.S. 14:30.1. Because Defendant received the mandatory minimum under La. R.S. 14:30.1, the court's failure to observe the statutory delay is harmless error. State v. Green , 2010-1355, p. 12 (La. App. 4 Cir. 6/22/11), 69 So.3d 695, 703.
Sufficiency of the Evidence
In his first assignment of error, Defendant argues the evidence is insufficient to support his conviction for second degree murder.
When reviewing the sufficiency of the evidence to support a conviction, Louisiana appellate courts apply the standard enunciated in Jackson v. Virginia , 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Under this standard, the appellate court must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proven beyond a reasonable doubt. State v. Tate , 2001-1658, p. 4 (La. 5/20/03), 851 So.2d 921, 928.
"The principal criterion of a Jackson v. Virginia review is rationality." State v. Mussall , 523 So.2d 1305, 1310 (La. 1988). "In reviewing the evidence, the whole record must be considered because a rational trier of fact would consider all the evidence, and the actual trier of fact is presumed to have acted rationally until it appears otherwise." Id. (emphasis in original). "If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier's view of all the *913 evidence most favorable to the prosecution must be adopted."
State v. Egana , 1997-0318, p. 6 (La. App. 4 Cir. 12/3/97), 703 So.2d 223, 228 ; Mussall , supra . It is not the function of the appellate court to assess the credibility of witnesses or reweigh the evidence. State v. Scott , 2012-1603, p. 11 (La. App. 4 Cir. 12/23/13), 131 So.3d 501, 508. Credibility determinations, as well as the weight to be attributed to the evidence, are soundly within the province of the trier of fact. Id. "Moreover, conflicting testimony as to factual matters is a question of weight of the evidence, not sufficiency. Such a determination rests solely with the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness." Id. "Absent internal contradiction or irreconcilable conflict with the physical evidence, a single witness' testimony, if believed by the fact finder, is sufficient to support a factual conclusion." State v. De Gruy , 2016-0891, p. 11 (La. App. 4 Cir. 4/5/17), 215 So.3d 723, 730, writ denied , 2017-0752 (La. 1/9/18), 231 So.3d 652.
Second degree murder, as applicable in this case, requires evidentiary proof beyond a reasonable doubt to establish the killing of a human being "when the offender has specific intent to kill or to inflict great bodily harm." La. R.S. 14:30.1A(1). "Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La. R.S. 14:10(1). "Specific intent may be inferred from the circumstances surrounding the offense and the conduct of the defendant." State v. Bishop , 2001-2548, p. 4 (La. 1/14/03), 835 So.2d 434, 437 ; State v. Caliste , 2012-0533, p. 9 (La. App. 4 Cir. 9/4/13), 125 So.3d 8, 14.
In this case, Defendant concedes that he killed the victim. However, he claims that he was justified in committing the killing as he allegedly shot the victim in self-defense. La. R.S. 14:20 defines a justifiable homicide, in pertinent part, as one "committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger." In a homicide case, when the defendant asserts he acted in self-defense, the State bears the burden of establishing beyond a reasonable doubt that the defendant did not act in self-defense. State v. Taylor , 2003-1834, p. 7 (La. 5/25/04), 875 So.2d 58, 63. "The fact that an offender's conduct is justifiable, although otherwise criminal, shall constitute a defense to prosecution for any crime based on that conduct." La. R.S. 14:18. The defense of justification can be claimed "[w]hen the offender's conduct is in defense of persons or of property under any of the circumstances described in Articles 19 through 22." See La. R.S. 14:18(7) (referencing La. R.S. 14:19 - 14:22 ). La. R.S. 14:20 A(1) specifically applies if a homicide is "committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger." See State v. Reed , 2014-1980 (La. 9/7/16), 200 So.3d 291, 309, reh'g granted in part , 2014-1980, p. 21 (La. 10/19/16), 213 So.3d 384, and cert. denied , --- U.S. ----, 137 S.Ct. 787, 197 L.Ed.2d 258 (2017), reh'g denied , --- U.S. ----, 137 S.Ct. 1615, 197 L.Ed.2d 738 (2017). Further, "[a] person who is the aggressor or who brings on a difficulty cannot claim the right of self-defense unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that he *914 desires to withdraw and discontinue the conflict." Id. , (citing La. R.S. 14:21 ).
Thus, the issue we must address is whether the State presented sufficient evidence beyond a reasonable doubt that the homicide was not justified.
At trial, the jury was presented with two versions of the circumstances leading up to the victim's shooting death. The State presented the testimony of Mr. Moore, Durrell and Ms. Williams, each of whom testified that Defendant was the aggressor in the altercation. Although both the victim and Defendant were involved in a verbal confrontation, Ms. Williams testified that it was Defendant who escalated the conflict by retrieving a firearm from a nearby vehicle and returning to the scene to continue the argument with the victim. All three of the State's witnesses reported that Defendant was armed and the victim was not. Additionally, these witnesses reported that Defendant pointed the gun at the victim while the victim was unarmed, that the victim made no threatening gestures or physical contact toward Defendant, and the victim never physically behaved as if he was reaching for a weapon. Mr. Moore testified that, although he attempted to quell the dispute by standing between the victim and Defendant, Defendant raised his weapon and began shooting after being urged to do so by one of his associates. Mr. Moore's testimony was corroborated by both Durrell and Ms. Williams.
The jury also heard testimony from the State's witnesses to indicate that Defendant fired multiple shots, including shots fired after the victim had fallen. Also, instead of reporting that he acted in self-defense at the time of the shooting, Defendant ran away from the scene of the crime.
Defendant argues, as evidence that he acted in self-defense, that he never denied shooting the victim but claimed self-defense immediately. Defendant's claim is belied by the record, however, as he initially denied being at the scene of the crime and denied that he even knew the victim. The jury heard and read his recorded statement and made its own credibility determinations. Defendant was heard admitting to the shooting of the victim, allegedly in self-defense, only after he was confronted by law enforcement with the significant evidence against him, including witnesses who placed him at the scene.
The defense's version of the shooting, on the other hand, centered on the theory that the victim, Mr. Moore and Durrell were affiliated with a gang named "Money Over Everything" but no definitive evidence supported this claim and, specifically, no evidence was offered to show the victim was a gang member. Although the defense attempts to attack the credibility of Mr. Moore and Durrell based on the fact they were both serving time for violent crimes, the jury was made aware of the witnesses' incarceration and crimes and made its own assessment of the weight to be given to their testimony. Also, the testimony of Ms. Williams corroborated Mr. Moore's and Durrell's accounts and the defense did not discredit her testimony.
Furthermore, '[t]he determination of credibility is a question of fact within the sound discretion of the trier of fact and will not be disturbed unless clearly contrary to the evidence." State v. Richards , 2011-0349, p. 9 (La. App. 4 Cir. 12/1/11), 78 So.3d 864, 869 (citation omitted). Most of the defense argument that the victim was a threat to Defendant was contingent on the testimony of Mr. Anderson, who was thoroughly discredited at trial. Mr. Anderson did not see the shooting itself and could not counter the eyewitness testimony.
*915 Mr. Anderson's trial testimony contradicted his earlier statements to the district attorney and the detective that he did not see the victim at all on the day of the shooting. He also stated at trial that he saw the victim clutching a gun, an account he had not previously provided to law enforcement. The prosecutor established that Mr. Anderson was wrong about the time frame of the shooting and then impeached Mr. Anderson with a false statement he made to the jury that he had not spoken to Defendant in a month when, in fact, he had spoken with him just days before the trial. Finally, Mr. Anderson conceded that he was currently jailed with Defendant and that Defendant was involved in a relationship with Mr. Anderson's sister. The jury rejected his testimony.
Based upon the evidence the State presented at trial, we find a rational trier of fact could have found, beyond a reasonable doubt, that the killing carried out by Defendant was not justified. Moreover, under the standard of Jackson v. Virginia, supra , the jury rationally concluded that the evidence at trial established Defendant had the specific intent to kill or to inflict great bodily harm, and thus convicted him of second degree murder.
Right to Present a Defense
In his second assignment of error, Defendant maintains he was prevented from presenting a defense because the trial court precluded the introduction of the following evidence: 1) a photograph that allegedly depicted the victim holding a gun; 2) evidence that the victim had a previous adjudication for a weapons offense; 3) evidence that the victim made threats on social media against Defendant; and 4) the testimony of defense witness, Torrey Lewis, purported to support that the victim had previously threatened Defendant. Defendant asserts that this evidence would have shown the bad character of the victim and prior threats made by the victim, and by ruling the evidence inadmissible, the trial court unfairly restricted his ability to present his self-defense claim.
In State v. Van Winkle , 1994-0947, p. 5 (La. 6/30/95), 658 So.2d 198, 201-202, the Louisiana Supreme Court discussed a defendant's right to present a defense:
A criminal defendant has the constitutional right to present a defense. U.S. Const. amend. 6 ; La. Const. Art. 1 § 16 ; Washington v. Texas , 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967) ; State v. Gremillion , 542 So.2d 1074 (La. 1989) ; State v. Vigee , 518 So.2d 501 (La. 1988). Due process affords the defendant the right of full confrontation and cross examination of the State's witnesses. Chambers v. Mississippi , 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973) ; State v. Mosby , 595 So.2d 1135 (La. 1992). It is difficult to imagine rights more inextricably linked to our concept of a fair trial.
Evidentiary rules may not supersede the fundamental right to present a defense. Id. at p. 5, 658 So.2d at 202. Generally, a trial court's ruling as to the admissibility of evidence will not be disturbed absent a clear abuse of discretion. State v. Griffin , 2015-0125, p. 24 (La. App. 4 Cir. 9/16/15), 176 So.3d 561, 575 (citing State v. Cyrus , 2011-1175, p. 20 (La. App. 4 Cir. 7/5/12), 97 So.3d 554, 565 ). Additionally, a trial court's determination that a defendant has not laid a sufficient evidentiary foundation upon which to introduce testimony concerning the victim's dangerous character will not be disturbed on appeal, absent a finding of clear error. State v. Jackson , 419 So.2d 425, 427 (La. 1981).
In the instant case, Defendant submits that evidence of the victim's bad character or his threats supported a plea of self-defense, *916 and that the evidence was admissible under La. C.E. art. 404. This statutory provision provides, in pertinent part:
A. Character evidence generally . Evidence of a person's character or a trait of his character, such as a moral quality, is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except:
* * *
(2) Character of victim.
(a) Except as provided in Article 412,[4] evidence of a pertinent trait of character, such as a moral quality, of the victim of the crime offered by an accused, or by the prosecution to rebut the character evidence; provided that in the absence of evidence of a hostile demonstration or an overt act on the part of the victim at the time of the offense charged, evidence of his dangerous character is not admissible ...
La. C.E. art. 404 (A)(2)(a) (emphasis added.)
In State v. Williams, 1996-1587, pp. 7-8 (La. App. 4 Cir. 4/16/97), 693 So.2d 249, 253-54, this court discussed the use of character evidence with respect to the victim of a crime:
When a defendant pleads self-defense, evidence of the victim's dangerous character or of threats against the defendant is relevant to show the victim was the aggressor and that the defendant's fear of danger was reasonable. State v. Edwards, 420 So.2d 663, 669 (La.1982) ; State v. Montz, 92-2073 (La. App. 4th Cir.2/11/94), 632 So.2d 822, 824-825, writ denied, 94-0605 (La. 6/3/94), 637 So.2d 499.
For such evidence to be admissible, the defendant must first produce evidence that at the time of the incident the victim made a hostile demonstration or committed an overt act against him of such character that would have created in the mind of a reasonable person the fear that he was in the immediate danger of losing his life or suffering great bodily harm. State v. Gantt, 616 So.2d 1300, 1304 (La. App. 2nd Cir.1993), writ denied, 623 So.2d 1302 (La.1993). An overt act is any act which manifests to the mind of a reasonable person a present intention to kill or inflict great bodily harm. Edwards, supra at 669.
Once evidence of an overt act is established, evidence of the victim's threats to the defendant and of the victim's dangerous character are admissible: (1) to show the defendant's reasonable apprehension of danger justifying his conduct and (2) to help determine who was the aggressor. Edwards, supra at 670.
If the purpose is to show the defendant's reasonable apprehension of danger, it must be shown that the defendant knew of the victim's prior threats or reputation. Edwards, supra, at 670 ; State v. Eishtadt, 531 So.2d 1133, 1135 (La. App. 4th Cir.1988). Once this knowledge is established, evidence of the victim's character, both general reputation and specific threats or acts of violence against the defendant are admissible. Edwards, supra, at 670.
If the purpose is to show that the victim was the aggressor, there is no requirement that the defendant know of the victim's prior acts or reputation. Eishtadt, supra at 1135.
(Emphasis in original).
Based upon the foregoing, before the trial court could admit character evidence *917 of the victim, Defendant was required to show an overt act of possible aggression by the victim. Defendant argues that the defense established an overt act through the testimony of Mr. Anderson but that the trial court wrongfully discredited the testimony, thus interfering with the fact-finding function of the jury.
The evidence tending to establish an overt act must be "appreciable." State v. Lee , 331 So.2d 455, 459 (La. 1975), original opinion reinstated on reh'g (La. 1976). When appreciable evidence of the overt act is in the record, the trial court cannot infringe on the fact-finding function of the jury by disbelieving the defense testimony and thereby deny the accused a defense permitted him by law. Id. A trial court should not make a "credibility evaluation" of the overt act evidence being offered in determining its admissibility. Edwards , 420 So.2d at 669.
In this case, the testimony of eyewitnesses presented by the State proved the victim was unarmed and did not make a hostile demonstration or commit an overt act against Defendant of such character that would have created in the mind of a reasonable person the fear that he was in the immediate danger of losing his life or suffering great bodily harm. The defense presented the testimony of Mr. Anderson, who reported for the first time at trial, having given contradictory statements to law enforcement and the district attorney on several occasions prior to trial, that the victim threatened to kill Defendant and that he witnessed the victim clutching a weapon during the verbal dispute between Defendant and the victim. However, Mr. Anderson's trial testimony was not given until after the defense had moved to admit and been precluded from admitting character evidence of the victim. The defense did not re-urge its argument that the evidence should be admitted after Mr. Anderson had testified. Thus, at the time the trial court's ruling was made, the only evidence before the court was the eyewitness testimony establishing that the victim was both unarmed and did not behave in a threatening manner toward Defendant and no overt act showing aggression on the part of the victim was presented. Based on the record before this Court, the trial court did not err by excluding character evidence of the victim at trial as there was no appreciable evidence of an overt act by the victim. This assignment of error has no merit.
Incomplete Record on Appeal
In his third assignment of error, Defendant claims his rights under the Fifth and Fourteenth Amendments to the United States Constitution were abridged by an incomplete record on appeal. Specifically, he complains the record does not contain a transcription of the bench conferences which occurred during trial,[5] thus precluding a determination of whether significant errors occurred off the record.
Louisiana Constitution Article I § 19 guarantees a defendant a right of appeal "based upon a complete record of all evidence upon which the judgment is based." Additionally, La. C.Cr.P. art. 843 provides in pertinent part:
*918 In felony cases, ... the clerk or court stenographer shall record all of the proceedings, including the examination of prospective jurors, the testimony of witnesses, statements, rulings, orders, and charges by the court, and objections, questions, statements, and arguments of counsel.
"The trial judge is duty-bound to see that the court reporter makes a true, complete, and accurate record of the trial." State v. Higginbotham , 2011-0564, p. 6 (La. 5/6/11), 60 So.3d 621, 624 (citing State v. Landry, 1997-0499 (La. 6/29/99), 751 So.2d 214, 216 ). "[W]here a defendant's attorney is unable, through no fault of his own, to review a substantial portion of the trial record for errors so that he may properly perform his duty as appellate counsel, the interests of justice require that a defendant be afforded a new, fully recorded trial." Id. ( citations omitted). In State v. Landry , the Louisiana Supreme Court explained a defendant has a right to a complete transcript of the trial proceedings, "particularly where counsel on appeal was not counsel at trial." Landry , 1997-0499, p. 3, 751 So.2d at 215 (citations omitted).
An incomplete record, however, is not in and of itself a reason for reversal, and an incomplete record may be adequate for full appellate review. State v. Bright , 2000-1255, p. 7 (La. App. 4 Cir. 2/6/02), 809 So.2d 1112, 1117. Appellate review in Louisiana is restricted to questions of law based on defense objections and assignments of error. State v. Francis , 345 So.2d 1120, 1125 (La. 1977) (citing La. Const. art. 5, § 5 (C) (1974) and La. C.Cr.P. art. 841 ), cert. denied , 434 U.S. 891, 98 S.Ct. 267, 54 L.Ed.2d 177 (1977). Consequently, when the transcript and record contain the portions necessary to address the issues actually raised on appeal, including those portions where objections were made by counsel, the record is constitutionally sufficient for a meaningful appeal. Schwander v. Blackburn , 750 F.2d 494 (5th Cir.1985).
The Louisiana Supreme Court has enunciated a three-part standard for reviewing incomplete record claims. State v. Frank, 99-0553, pp. 20-21 (La. 1/17/01), 803 So.2d 1, 19-20. First, "[m]aterial omissions from the transcript of the proceedings at trial bearing on the merits of an appeal will require reversal." Id. at pp. 20-21, 803 So.2d at 20. Second, "inconsequential omissions or slight inaccuracies do not require reversal." Id. at p. 21, 803 So.2d at 20. Third, "a defendant is not entitled to relief because of an incomplete record absent a showing of prejudice based on the missing portions of the transcripts. Id. (citations omitted).
Defendant complains that the record lacks transcriptions of the bench conferences which occurred during trial. Specifically, Defendant lists the following instances where bench conferences were not transcribed: 1) a motion in limine handled on January 23, 2017, concerning evidence that the victim had a prior weapons conviction;[6] 2) the State's "objectionable comments" during voir dire; 3) the State's introduction of an Instagram photo via the victim's mother; 4) hearsay testimony of Det. Ward; 5) defense counsel's questioning of Det. Ward relative to the statements of a witness named "Miss Anderson;" 6) the State's re-direct examination of Det. Ward about six individuals called to the crime scene by the victim's friend; 7) the State's re-direct examination *919 of Det. Ward regarding a prior motion hearing; 8) the trial court's granting of the State's request to re-cross Lamont Anderson at the end of the defense redirect examination; and 9) the State's objection to defense counsel's questioning of defense witness Torrey Lewis regarding an incident involving the victim at a grocery store.
The Louisiana Supreme Court noted in State v. Deruise , 1998-0541, p. 14-15 (La. 4/3/01), 802 So.2d 1224, 1236, as follows:
This court has never articulated a per se rule either requiring the recording of bench conferences or exempting them from the scope of La.C.Cr. P. art. 843 ; State v. Hoffman , 98-3118, (La.4/11/00), 768 So.2d 542, 586. However, in Hoffman , we interpreted Article 843's requirement that "objections" and "arguments" be recorded as normally applying only to objections made in open court and the arguments of counsel in closing, because only these objections and arguments rise to a level of materiality sufficient to invoke Article 843. Id. We further determined in that case that, similarly, Art. I., § 19's mandate that "evidence" be recorded does not encompass bench conferences; at least, not ones that do not satisfy the materiality requirements of La. Code Crim. Proc. art. 843. Id. at 587.
In the case sub judice , Defendant does not establish that the lack of transcriptions of the bench conferences held by the trial court constitute material omissions nor does he show how the alleged omissions from the record have affected his substantive rights. The record evidence does not indicate that Defendant was prevented from presenting any relevant evidence or that the failure to record bench conferences had a discernible impact on the proceedings. Further, Defendant fails to allege or prove any specific prejudice suffered by him as a result of not having the bench conferences transcribed. The trial proceedings which led to the un-transcribed bench conferences were transcribed in their entirety, and the rulings on those objections are evident from the record. Inasmuch as Defendant has failed to articulate any prejudice, the failure to transcribe the bench conferences is, at most, harmless error. This claim lacks merit.
Unconstitutionally Excessive Sentence
Defendant's fourth assignment of error challenges the excessiveness of Defendant's sentence to life imprisonment without benefit of parole, probation or suspension of sentence under both the U.S. Constitution as well as the Louisiana Constitution. Defendant was found guilty of second degree murder and received the statutory mandatory minimum sentence for his crime.
The Eighth Amendment to the United States Constitution prohibits cruel and unusual punishment, while Article I, § 20 of the Louisiana Constitution of 1974 also prohibits the imposition of excessive punishment. State v. Wilson , 2014-1267, p. 24 (La. App. 4 Cir. 4/29/15), 165 So.3d 1150, 1165. "The scope and authority of an appellate court's power to upset a district court's sentence is set forth in La. C.Cr.P. art. 881.4." Id. "The trial judge is afforded wide discretion in determining sentences, and the court of appeal will not set aside a sentence for excessiveness if the record supports the sentence imposed." State v. Williams , 2015-0866, pp. 12-13 (La. App. 4 Cir. 1/20/16), 186 So.3d 242, 250. "[A] sentence is excessive and unconstitutional if it is grossly out of proportion to the severity of the crime or if it is nothing more than the purposeless and needless imposition of pain and suffering."
*920 State v. Bonanno , 384 So.2d 355, 357 (La.1980) ; State v. Stevenson , 1999-2824, p. 3 (La. App. 4 Cir. 3/15/2000), 757 So.2d 872, 874. The excessiveness of a sentence is a question of law, and a reviewing court will not set aside a sentence absent a manifest abuse of discretion by the trial court. Wilson , 2014-1267, p. 24, 165 So.3d at 1165.
Defendant was eighteen years old at the time he committed the offense of second degree murder. He asserts, without legal support, that since he had only recently turned eighteen years of age, he is entitled to have his sentence imposed in consideration of Miller v. Alabama, 567 U.S. 460, 465, 132 S.Ct. 2455, 2460, 183 L.Ed.2d 407 (2012).
In Miller, supra , the United States Supreme Court held that a state's statutory sentencing scheme that mandates life imprisonment without parole, for those offenders under the age of eighteen years at the time they committed a homicide offense, violates the Eighth Amendment prohibition of "cruel and unusual punishments." The Miller Court did not prohibit life imprisonment without parole for juveniles, but rather required that the statutory sentencing scheme "authorize a sentencing court to consider an offender's youth and attendant characteristics as mitigating circumstances before deciding whether to impose the harshest penalty for juveniles who have committed a homicide offense." Williams , 2015-0866, p.13, 186 So.3d at 250 (citation omitted). In response to the Miller decision, the Louisiana Legislature enacted La. C.Cr. P. art. 878.1 and La. R.S. 15:574.4, providing procedures for determining parole eligibility for juvenile offenders.
First, neither Miller nor the statutes enacted in light of Miller by the Louisiana Legislature authorize this Court to apply the leniency granted to juveniles to Defendant, who was an adult at the time of his offense. Additionally, review of Defendant's sentencing held on May 17, 2017 shows that the trial court did not enumerate reasons for the sentence imposed; however, the failure of the trial court to enumerate specifically for the record the factors considered and the basis for the sentence as required by Article 894.1 does not render the sentence invalid. Wilson , 2014-1267, p. 24, 165 So.3d at 1165. An appellate court may uphold a sentence if the record clearly illuminates the sentencing choice and reflects that the sentence is not excessive. State v. Major , 1996-1214, p. 10 (La. App. 4 Cir. 3/4/98), 708 So.2d 813, 819 (articulation of the factual basis for a sentence is the goal of Art. 894.1, not rigid or mechanical compliance with its provisions. Where the record clearly shows an adequate factual basis for the sentence imposed, resentencing is unnecessary even when there has not been full compliance with Art. 894.1).
The evidence in this case supports the sentence of life imprisonment. The testimony of the State's eyewitnesses established that the victim was unarmed at the time of the shooting, and further, that the victim made no threatening gesture to suggest he had a gun in his waistband. This testimony was unrefuted by any credible evidence.
Further, Defendant's action just prior to the shooting belies his argument that he was in fear for his life at the time he encountered the victim. The testimony offered at trial shows Defendant walked away from the argument with the victim and retrieved the weapon that he used to kill the victim. Although a third party tried to diffuse the conflict and was able to get Defendant to lower his weapon, Defendant began shooting the victim after he was encouraged to do so by one of his associates. Defendant then stood over the victim and continued to fire the weapon even *921 after the fifteen-year old victim fell to the ground. The evidence supports the jury's conclusion that Defendant was the aggressor and unjustifiably shot the victim. Based upon the facts adduced at trial, Defendant's life sentence is not constitutionally excessive.
For all of the foregoing reasons, we affirm Defendant's conviction and sentence.
CONVICTION AND SENTENCE AFFIRMED

Det. Ward subsequently discovered that the high school picture given to him by school personnel was, in fact, a picture of Defendant, but that the biographical information sheet accompanying that photo belonged to a second "Clifford Williams," who was also a student attending Clark High School. Det. Ward discovered the error when he interviewed the second "Clifford Williams."

Miranda v. Arizona , 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Det. Ward's investigation established that Defendant did not have a permit to carry a concealed weapon.

La. C.E. art. 412 applies to sexual assault cases, inapplicable here.

On September 18, 2018, this Court ordered the court reporter in this case to prepare and file the transcripts of the in-chambers arguments heard on the State's motion in limine conducted on January 23, 2017, and all bench conferences held during this trial, or certificates of unavailability within thirty days of the order. On October 24, 2018, the court reporter filed a transcript of the motion in limine at which the court excluded the juvenile victim's arrest record. The court reporter also included a certificate of unavailability concerning the bench conferences.

As previously stated, a transcription of the January 23, 2017 motion hearing was subsequently provided by the court reporter.